**Jack G. WHITE**

v.

**ORANGE AUTO CENTER, et al.**

**No. 1:99–CV–311.**

United States District Court,
E.D. Texas,
Beaumont Division.

June 5, 2000.

Louis Claiborne Dugas, Michael Jacobellis, Clay Dugas & Associates, Orange, TX, for plaintiff.

Mark R. Lapidus, Jill McCarthy–Arntz, Brent Michael Cordell, Burck Lapidus & Lanza, Houston, TX, for defendants.

### MEMORANDUM ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

HEARTFIELD, District Judge.

The court heretofore ordered that this matter be referred to the Honorable Earl

S. Hines, United States Magistrate Judge, at Beaumont, Texas, for consideration pursuant to applicable laws and orders of this court. The court has received and considered the Report of the United States Magistrate Judge filed on May 4, 2000, pursuant to such order, along with the record, pleadings and all available evidence. No objections to the Report of the United States Magistrate Judge were filed by the parties.

Accordingly, the findings of fact and conclusions of law of the magistrate judge are correct and the Report of the Magistrate Judge filed on May 4, 2000, is **ADOPTED.** It is therefore

**ORDERED** and **ADJUDGED** that defendants Orange Auto Center's and Clay Higgins' Motion for Summary Judgment is **DENIED.**

*REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

HINES, United States Magistrate Judge.

Plaintiff ("White") sues his former employer ("Orange Auto"), former supervisor ("Higgins"), and their parent or successor firms ("E.T.Entities"). White alleges he was discharged in violation of federal laws prohibiting employment discrimination on account of disability and age. Invoking the court's supplemental jurisdiction, White also asserts Texas common law tort claims seeking to impose liability on defendants for: (a) negligent supervision and retention of employees, and (b) intentional infliction of emotional distress.

Orange Auto and Higgins move for partial summary judgment regarding White's federal claims. (*See* Docket No. 14.) This report addresses that motion.[1]

### I. Factual Background

This report generally adopts the version of facts advocated by White, or as recited by defendants without opposition from White:[2]

White is 63 years old. He suffers from poor vision, cataracts, and macular degeneration disease. His best corrected vision is 20/200 Snellen.[3]

For 28 years, beginning in 1970, White was employed as service manager for an automobile dealership in the city of Orange, Texas.[4] His job duties included: (1) hiring and firing mechanics, cashiers, service writers, and porters; (2) overseeing service repairs, used car repairs, and warranty repairs; and (3) authorizing claims.

1. This case is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law. (*See* Docket No. 18); *see also* 28 U.S.C. § 636(b)(1)(B) and Local Rules for the Assignment of Duties to United States magistrate judge.

2. When considering a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

3. Hermann Snellen, a Dutch ophthalmologist, designed the Snellen Test, presenting letters of graduated sizes to determine the smallest size that can be read at a standard distance. *See e.g.*, DORLAND'S MEDICAL DICTIONARY at 1539.

The Snellen test measures the distance a person stands from the eye chart (usually 20 feet) and the smallest line the person is able to read at that distance. It is expressed as a fraction. The top number refers to the distance from the chart—usually 20 feet. The bottom number indicates the distance at which a person with normal eyesight could read the line with the smallest letters that one could correctly read. 20/200 indicates that the line White could correctly read at 20 feet could be read by a person with normal vision at 200 feet.

4. When White was first hired, the dealership was known as Jim Austin Olds/Cadillac. In 1983, the dealership's name changed to Austin–Lee Auto Center. The dealership's owners changed again in 1998, and thereafter the dealership was known as Orange Auto Center.

488

In order to perform these duties, White used: (1) eyeglasses; (2) a magnifying glass for reading; (3) a magnifying glass for reading computer screens; (4) eyeglasses for driving automobiles; and (5) a telescope for seeing objects in far distance.

When ownership of the dealership changed in 1998, Higgins was hired as general manager. Higgins thus became White's superior. Less than a month later, Higgins terminated White. Higgins told White he was terminated because Orange Auto eliminated White's position. White was 60 years old at the time.

## II. White's Complaint

White complained to the Equal Employment Opportunity Commission on June 19, 1998. He alleged violations of the Americans With Disabilities Act of 1990[5] (ADA) and Age Discrimination in Employment Act[6] (ADEA). On March 31, 1999, the Equal Employment Opportunity Commission issued a right to sue letter to White without making findings or issuing a determination to his claims.

White then instituted this action invoking federal original jurisdiction[7] over his ADA and ADEA claims, and supplemental jurisdiction[8] over related state law claims. In his original complaint, White alleges that Orange Auto and Higgins discriminated against him because of his age and also because of his disability attributable to poor vision. White bases these federal claims on allegations that shortly before he was terminated, Higgins made derogatory comments concerning his age and vision. Further, White alleges that defendants hired younger men to replace him. White also alleges that Orange Auto Center, E.T. Holdings/Texas, Inc., and E.T. International, Ltd., were negligent in supervising and training Higgins, and in continuing to employ Higgins after knowledge of Higgins' discriminatory acts without taking corrective measures. Finally, White alleges that such conduct intentionally or recklessly inflicted emotional distress in an extreme and outrageous manner, causing him injury.

White seeks back pay and lost benefits, reinstatement of front pay, mental anguish in the past and future, attorney's fees, and costs for his ADA and ADEA claims. White also seeks punitive damages.

## III. Proceedings

White's original complaint—filed on May 18, 1999,—named only Orange Auto and Higgins as defendants. White did not request a jury. Orange Auto's and Higgins's original answer also did not demand a jury trial. Accordingly, the action was placed on a non-jury docket and assigned to United States district judge, Thad Heartfield, for trial.

Judge Heartfield conducted a pretrial management and scheduling conference on October 13, 1999. At that time, prospects for early settlement via mediation appeared favorable. Thus, Judge Heartfield referred the matter to a mediator, and directed that mediation proceed on or before February 25, 2000. Judge Heartfield also entered a docket control order setting other pretrial deadlines and directing that the case proceed to trial during the month of April, 2000, contingent upon the outcome of mediation.

Mediation resulted in an impasse. White amended his complaint to add the E.T. Entities as defendants. Orange Auto and Higgins moved for summary judgment. After these developments indicating that the matter might be destined for a plenary trial, the case was referred to the undersigned magistrate judge.

When the E.T. Entities filed their original answer, they demanded a jury trial. Inasmuch as this jury demand was timely, their motion to place the action on the jury

5.  See 42 U.S.C. § 12101 et seq.

6.  See 29 U.S.C. § 621 et seq.

7.  See 28 U.S.C. § 1331.

8.  See 28 U.S.C. § 1367.

docket was granted. The case is now scheduled for jury trial on August 8, 2000.

## IV. Motion For Summary Judgment

Orange Auto and Higgins move for summary judgment against White's ADA claim on the ground that White's impaired vision is not a disability for which ADA provides protection. These defendants rely on White's deposition testimony to the effect that with assistance of corrective lenses and other visual aids, he can care for himself, work, drive, etc. This evidence, defendants contend, shows that White's visual limitations do not substantially limit major life activities. Thus, as a matter of law, White has no viable claim under ADA.

Orange Auto and Higgins move for summary judgment against White's ADEA claim on the ground that White cannot establish a *prima facie* case of age discrimination. They argue that White cannot prove a *prima facie* case by showing his job duties were reassigned to younger workers because White's job position was entirely eliminated.

White responds to defendants' ADA arguments by arguing that his visual limitations are so severe that even when mitigated with corrective lenses and visual aids, he remains substantially limited in his ability to engage in major life activities. White argues that he cannot read even with the use of his glasses. With the aid of his spy glass, however, he can read certain documents, but it takes him 3 times longer. He cannot judge distance of objects to catch them. He cannot drive at high speeds. He has limitations walking around. He has difficulties seeing in the mirror to shave. He cannot see food in dark restaurants.

Alternatively, White argues that he fits within ADA's protective penumbra under other ADA provisions defining disability

as: (a) a record of an impairment (that substantially limits major life activities), and (b) being regarded as having such an impairment. Specifically, White argues on these points that he has a record of being "legally blind," and he proffers evidence that Higgins questioned his ability to do his job because of poor vision, thus showing that his employer regarded his visual impairments as a disability.

White responds to defendants' ADEA arguments by presenting evidence which he contends shows that his position was not eliminated as claimed by defendants. Specifically, White offers evidence showing that following his termination, Orange Auto reassigned David Mingle, the body shop manager, to perform White's job. Mingle was not given a formal title of service manager. However, a short time later, Orange Auto hired Joe Edgerton with the formal title of service manager.[9] Both Mingle and Edgerton are younger than White.

## V. Discussion

This section begins with a précis of undisputed and rudimentary principles governing disposition of motions for summary judgment and analysis of employment discrimination cases generally. Next, the analysis turns to the specific federal statutes at issue and relevant jurisprudence developed thereunder. Finally, the section concludes with an application of principles of analysis to the motion for summary judgment against each cause of action:

### A. Summary Judgment Standards

A party may move a court to enter summary judgment. FED. R. CIV. P. 56(a) and (b). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact

9. The record does not reflect the exact date that Orange Auto Center hired Edgerton as service manager. White submitted a newspaper article announcing the hire, but the article did not include a date. (*See* Pl.'s Resp.,

Ex. 11.) An approximate date of November, 1998, is derived from the affidavit of J.D. Keener, a former Orange Auto Center technician. (*See* Aff. of J.D. Keener.)

and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* FED. R. CIV. P. 56(c). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The admissibility of evidence is subject to the same standards and rules that govern the admissibility of evidence at trial. *See Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 650 n. 3 (5th Cir.1992). Summary judgment is proper after "adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

The moving party bears the initial burden of demonstrating an absence of evidence supporting the non-movant's case. *See id.* at 325, 106 S.Ct. 2548. When the burden of establishing the issue at trial is on the non-movant, the movant accomplishes this merely by pointing out the absence of evidence in the record supporting the issue. *See id.* at 323–24, 106 S.Ct. 2548.

After the movant meets its burden, the non-movant must designate specific facts showing there is a genuine issue for trial. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the court considers the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the non-movant, the non-movant may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial. *See Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998).

## B. Analysis of Federal Employment Discrimination Claims

Divers federal statutes protect several distinct classes of citizens from employment discrimination on account of their minority status. The first such statute enacted in modern times is the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C. § 2000e et seq., commonly referred to as "Title VII."[10] Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin.[11]

Title VII jurisprudence acknowledges that direct evidence of discrimination is rare. *See Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir.1994) ("Because direct evidence of employment discrimination is rare, courts have devised indirect or inferential methods of proving such discrimination"). Thus, an employee may use indirect evidence and reasonable inferences to establish a claim alleging disparate treatment. *See Scales v. Slater,* 181 F.3d 703, 709 (5th Cir.1999) ("Direct evidence of an employer's discriminatory intent is rare; therefore, Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence."). Toward that end, courts developed early and continue to utilize a burden-shifting analysis known as the "McDonnell Douglas" test. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under this analytical model, a plaintiff must first allege and present evidence sufficient to establish a *prima facie* case of

---

**10.** The statute is referred to as Title VII because it was enacted in § 701 et seq., of the Civil Rights Act of 1964.

**11.** *See* 42 U.S.C. § 2000e–2(a) ("It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").

unlawful discrimination. *See id.* Once such showing is made, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the challenged action. *See id.* at 802–03, 93 S.Ct. 1817. If defendant satisfies its burden of production, plaintiff must next demonstrate that the reason articulated by defendant is a pretext for proscribed discrimination. *See id.* at 805, 93 S.Ct. 1817. Notwithstanding these shifting evidentiary burdens, the burden of persuasion remains at all times with plaintiff. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). That burden is to show discriminatory intent on defendant's part. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

At the final analytical step, it is not enough for an employee complaining of discrimination to demonstrate that the employer's proffered reason for the challenged action is pretextual generally. The employee must show specifically that the proffered reason is pretextual for unlawful discrimination proscribed by the statute. "Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche,* 190 F.3d 398, 404 (5th Cir.1999); *see also Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (holding that to avoid summary judgment in an ADEA action, an employee must present evidence that both: (1) rebuts the employer's nondiscriminatory reason, and (2) creates an inference that age was a determinative factor in the challenged employment decision).

■■■ In this respect, a subjective belief that one has been the victim of unlawful discrimination is insufficient to raise a genuine issue of material fact as to wheth-

er an employer subsequently acted with discriminatory intent. *See Grimes v. Texas Dep't of Mental Health and Mental Retardation,* 102 F.3d 137, 139 (5th Cir. 1996) (holding that conclusory allegations, unsubstantiated assertions, and subjective beliefs are insufficient to support discrimination claims). Similarly, stray derogatory remarks relating to minority status of an employee within a protected class are insufficient. *See Sreeram v. Louisiana State Univ. Med. CenterShreveport,* 188 F.3d 314, 320 (5th Cir.1999) ("[I]t is well settled that 'stray remarks' alone will not overcome overwhelming evidence corroborating defendants' non-discriminatory rationale."). Thus, a single remark of "Buckwheat,"[12] and a single allusion to "Porch Monkey," over a five-year period, are insufficient to support a racial discrimination claim. *See Boyd v. State Farm Ins. Companies,* 158 F.3d 326, 329–30 (5th Cir.1998); *but see Brown v. East Mississippi Elec. Power Ass'n,* 989 F.2d 858, 863 (5th Cir.1993) (concluding that routine use of the word "nigger" was direct evidence of discrimination).

■■ Determining when a remark is so stray as to not shed any light on whether the employer made the employment decision based on prohibited discrimination depends on its context. Remarks lacking probative value when uttered randomly and remotely by co-workers may be viewed differently when uttered by a supervisor with ultimate authority over the employment decision at issue and proximately in time to the challenged action. *See Krystek v. University of Southern Miss.,* 164 F.3d 251, 256 (5th Cir.1999).

### C. Federal Age and Disability Anti-Discrimination Statutes

The federal statutes at issue here protect against employment discrimination on account of disability (ADA) and advancing

---

12. "Buckwheat" is the stereotypical black character from the "Our Gang" or "Little Rascals" television series. However, in the context of employment discrimination law, the term "Buckwheat" is generally considered to be a racial slur or epithet. *See Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1266 (7th Cir.1991).

age (ADEA). The McDonnell Douglas analytical model applies to White's claims on both statutes. *See Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995) (applying McDonnell Douglas test to ADA action); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149 (5th Cir.1995) (applying McDonnell Douglas test to ADEA action).

### 1. Americans With Disabilities Act of 1990

The Americans with Disabilities Act provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### a. Prima Facie Case

■ The ADA grants to citizens a right of private causes of action to enforce the statute and to recover damages occasioned by violations thereof. *See Buchanan v. City of San Antonio,* 85 F.3d 196, 200 (5th Cir.1996). "To make out a prima facie case of discrimination under the ADA, [plaintiff] must show that (a) she has a disability; (b) she is a qualified individual for the job in question; and (c) an adverse employment decision was made because of her disability." *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024 (5th Cir.1999) (quoting 42 U.S.C. § 12112(a)).

Thus, a plaintiff must first establish a disability. *See Bridges v. City of Bossier,* 92 F.3d 329, 332 (5th Cir.1996). The ADA defines "disability" as: "(A) a physical or mental impairment that *substantially limits* one or more of the *major life activities*

of such individual; (B) a record of such an impairment; or (C) being regarded [by an employer or others] as having such an impairment." 42 U.S.C. § 12102(2) (emphasis added). The ADA identifies a "qualified individual" as "an individual with a disability, who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

### b. Impairments that Substantially Limit Major Life Activities

The ADA does not define "substantially limits" or "major life activities." However, the Fifth Circuit looks to the Equal Employment Opportunity Commission ("EEOC") regulations promulgated under the ADA to provide significant guidance. *See Talk,* 165 F.3d at 1024. The EEOC's regulations, among other things, define "physical impairment" to mean "[a]ny physiological disorder ... affecting ... special sense organs." [13] Similarly, EEOC regulations define "substantially limits" to mean "[u]nable to perform a major life activity that the average person in the general population can perform." [14] Finally, the regulations define "major life activities" to mean functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." [15]

EEOC and Justice Department interpretive guidelines provide that the determination whether an individual is substantially limited in a major life activity must be made on a case by case basis. [16] EEOC regulations list three factors as relevant to this determination:

(1) The nature and severity of the impairment;

---

**13.** 29 C.F.R. § 1630.2(h).

**14.** 29 C.F.R. § 1630.2(j).

**15.** 29 C.F.R. § 1630.2(I).

**16.** *See* 29 C.F.R. Pt. 1630, App.; *see also Deas v. River West,* 152 F.3d 471, 478 (5th Cir. 1998) ("We have consistently emphasized that an individualized, case-by-case determination of disability best achieves the purposes of the ADA").

(2) Its duration or expected duration; and

(3) Its permanent or expected permanent or long-term impact.[17]

### c. Jurisprudence

■ While administrative regulations, interpretive guidelines, and lower courts originally embraced an expansive view of ADA disability, the United States Supreme Court recently decided that congressional intent requires a narrower view. In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the court held that under the ADA, the determination whether an impairment "substantially limits" one or more major life activities is made with reference to the mitigating measures an individual employs. Thus, a person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. *Id.*, 119 S.Ct. at 2147.

■ Given this interpretation, ADA does not protect job applicants and employees from every slight based on their physical attributes, even though the employer's conduct might be viewed as irrational and unjustified discrimination because based on a characteristic beyond the individuals' control. In *Sutton*, severely myopic job applicants with uncorrected visual acuity of 20/200 or worse, but who—with corrective measures—had vision of 20/20 or better and functioned identically to individuals without similar impairments, were precluded from proving that the employer's vision requirement was based on myth and stereotype rather than a legitimate reason.[18] Similarly, the ADA was found to provide no succor to a discharged UPS mechanic suffering from extreme hypertension, but who—with medication—was not significantly restricted in his activities and in general could function normal-

ly and engage in activities that other persons normally do. *See Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 2138–39, 144 L.Ed.2d 484 (1999). Indeed, *Sutton* makes clear that under the ADA, employers may exercise preferences regarding physical attributes of their employees so long as those attributes do not rise to the level of substantially limiting impairments:

> By its terms, the ADA allows employers to prefer some physical attributes over others, and to establish physical criteria. . . . Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to decide that some limiting, but not substantially limiting impairments make individuals less than ideally suited for a job.

*Sutton*, 119 S.Ct. at 2150.

### 2. Age Discrimination and Employment Act

The Age Discrimination and Employment Act declares it to be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Thus, the ADEA prohibits an employer from discharging any individual because of such individual's age. *See Rhodes*, 75 F.3d at 991.

■ The ADEA also confers upon citizens the right to file private causes of action to enforce the provisions of the act and to recover damages occasioned by violations thereof. *See Dean v. American Security Ins. Co.*, 559 F.2d 1036, 1039 (5th

---

**17.** *See* 29 C.F.R. § 1630.2(j).

**18.** The airline's vision requirements applied only to applicants for positions as "global pilots." Persons with correctable visual impairments similar to plaintiffs were eligible for employment as regional pilots and pilot instructors. *Id.*, 119 S.Ct. at 2151.

Cir.1977) (inferring from the remedial enforcement scheme contemplated by the Act legislative intent to allow private suits for prompt reinstatement, promotion or other equitable relief coupled with lost wages, and liquidated damages) To establish an ADEA violation, a job applicant or employee must prove intentional discrimination because of the plaintiff's age. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336 (5th Cir.1997). To establish a *prima facie* case of age discrimination in a termination case, the employee must prove that:

(1) He was discharged;

(2) He was qualified for the position that he held;

(3) He was within the protected class at the time of discharge; and

(4) He was either: (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age.

*Fields v. J.C. Penney Co.*, 968 F.2d 533, 536 (5th Cir.1992). The third alternative of this last element applies in circumstances only when the employee is not replaced. *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999).

When a discharged employee establishes a *prima facie* case, a presumption of discrimination arises that the employer unlawfully discriminated against the employee. *See Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 n. 19 (5th Cir.1992). This presumption places on the employer the burden of producing evidence that the challenged employment action was taken for a legitimate, nondiscriminatory reason. *See Bauer*, 169 F.3d at 966. If the employer successfully articulates a legitimate, nondiscriminatory reason, then the inference of discrimination vanishes, and the employee is left with the ultimate burden of presenting evidence from which a reasonable trier of fact could infer age discrimination. *See Rhodes*, 75 F.3d at 993. To avoid summary judgment, an employee must present evidence that both: (1) rebuts the employer's nondiscriminatory rea-

son, *and* (2) creates an inference that age was a determinative factor in the challenged employment decision. *See id.* at 994.

## D. Application and Analysis

Orange Auto and Higgins argue that White cannot raise genuine issues of material fact sufficient to establish a prima facie case of discrimination on account of either disability or age. Since White can work and perform normal daily activities with the aid of corrective lenses and other mitigating visual aids, defendants argue that the rule of *Sutton* precludes his ADA claim. Since White's job position was entirely eliminated, defendants argue that he cannot show he was replaced by a younger person. The mere fact that his job duties were transferred to a younger employee is insufficient to raise a genuine issue of intentional age discrimination.

### 1. White's ADA Claim

Defendants' reliance on *Sutton* as an absolute bar to White's ADA claim is misplaced. In both *Sutton* and its companion case, *Murphy*, the impairments at issue were fully corrected with mitigating measures. In neither case was the court required to consider a claim similar to the instant case in which the employee contends he is disabled due to limitations that persist despite mitigation.

Under the present record, White's mitigated vision is no better than 20/200. Such visual acuity was noted in *Sutton* to effectively preclude numerous activities such as driving a vehicle, watching television or shopping in public stores. *See Sutton*, 119 S.Ct. at 2142. Under regulations of the Texas Department of Public Safety, visual acuity worse than 20/70, with or without corrective lenses with no further improvement possible, ordinarily results in denial of a driver's license. *See* 37 TEX. ADMIN. CODE § 15.51 (1976) (Texas Department of Public Safety, Drivers License Rules). Vision diminished to such

an extent also is sufficient to establish "legal blindness" and eligibility for total disability for purposes of the Social Security Act. *See* 42 U.S.C. § 416(i) (defining blindness as "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens"). Thus, common experience teaches that it is highly likely that White's ability to work or function identically to individuals without such impairments is likely to be significantly reduced.

Defendants argue nevertheless that White's own deposition testimony establishes that he is able to work, drive and engage in normal activities with mitigated vision. Defendants point to White's acknowledgment that the only thing he cannot do is drive at 80 mph and catch a fastball. (*See* Deposition of Jack G. White at 147–48.) These activities, defendants argue, do not constitute major life activities.

In this respect, defendants permissibly argue that *Sutton* teaches that persons whose impairments are largely corrected by mitigation are not disabled under ADA. However, White's statement about driving at 80 mph and catching fastballs does not exhaust the evidence. The record also establishes that while White can work, he requires special visual aids and additional time to complete tasks that non-impaired individuals do not need. While White has a driver's license, he cannot function identically to individuals without similar impairments. In light of his restrictions,[19] for example, he could not drive himself to an evening concert or to a night baseball game. Indeed, it is difficult to conceive how White could even drive himself to the federal courthouse for his trial due to the prohibition against expressway driving.[20]

In short, there exists a genuine issue of material fact as to whether White, when evaluated in his mitigated state, remains substantially limited in any major life activity. This issue precludes summary judgment on White's ADA claim.

### 2. White's ADEA Claim

Defendants argue that White cannot establish an essential element of a *prima facie* case, i.e., a showing that he was replaced either by someone outside the protected class or someone younger. Defendants argue that such a showing is impossible because White's job was eliminated entirely, and thus he was not replaced at all.

Defendants wholly ignore White's evidence that within months after his termination, defendants replaced him with a new service manager, Joe Edgerton. This evidence is sufficient to raise a genuine issue of material fact as to whether White's job was eliminated or whether he was replaced. This evidence, construed most favorably to White, is sufficient to establish this element of White's *prima facie* case.

Even if the facts established unequivocally that White's job position were eliminated, White could establish a *prima facie* case by an alternative method of proving that he was "otherwise discharged" because of his age. *See Fields*, 968 F.2d at 536. White has met this burden. He shows that Higgins made age-related and derogatory remarks both to White and co-workers on several occasions during the short month that White was employed after Higgins became general manager.[21]

---

**19.** The record reflects that White's Texas driver's license number is 04018322. The court may take judicial notice that his restrictions are:
   — corrective lenses;
   — daylight driving only;
   — no interstate driving; and
   — speed restriction of 45 mph.
Lexis database Finder; TXDL query run: 4/27/2000.

**20.** The court may take judicial notice that Orange, Texas, is east of the federal courthouse in Beaumont, and that the only highway access to Beaumont from the east is via Interstate Highway 10. All other access from the north and south is by expressway.

**21.** Higgins remarked to J.D. Keener that he wanted to bring some "young blood" into the dealership. (*See* Aff. of J.D. Keener.) Hig-

Given Higgins's supervisory capacity and the proximity of his remarks to White's termination, these statements cannot be determined as a matter of law to be stray remarks lacking probative value. Similarly, these statements elevate White's allegations beyond mere subjective belief. In short, this evidence is sufficient to raise a genuine issue of material fact as to whether White was otherwise discharged because of his age.

## VI. Conclusion

Orange Auto and Higgins move for summary judgment solely on the ground that White cannot establish a *prima facie* case of discrimination on account of either disability or age. In each instance, White has produced evidence sufficient to raise a genuine issue of material fact which, when considered in the light most favorable to him, is sufficient to establish a *prima facie* case of proscribed discrimination. Thus, summary judgment is not appropriate.

## VII. Recommendation

The motion for summary judgment should be denied because White has produced sufficient evidence to raise a genuine issue of material fact.

## VIII. Objections

Objections must be: (1) specific, (2) in writing, and (3) served and filed within ten days after being served with a copy of this report. *See* 28 U.S.C. § 636(b)(1); FED. R.CIV.P. 1(a), 6(b), and 72(b).

A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *see Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of unobjected-to factual findings and legal conclusions accepted by the district court, *see Douglass*

gins also called White an "elder" on two or three occasions. (*See* Deposition of Jack G.

*v. United Services Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir.1996) (en banc).