United States Court of Appeals
Fifth Circuit

**F I L E D**

July 16, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 05-51064

————————

JUANITA ALVARADO,

Plaintiff-Appellant,

versus

TEXAS RANGERS; TEXAS DEPARTMENT OF PUBLIC
SAFETY; COLLEEN MCHUGH, Chairman of the Commission on
Public Safety; BRUCE CASTEEL, Ranger Chief,

Defendants-Appellees.

————————

Appeal from the United States District Court
For the Western District of Texas

————————

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Juanita Alvarado ("Alvarado") appeals the district court's grant of summary judgment in favor

of her employer, the Texas Department of Public Safety ("DPS"), on her claim that she was denied

an appointment to DPS's Texas Rangers Division (the "Rangers") because of her sex (female), in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*

I

Alvarado first joined DPS as a trooper in 1988.[1] She subsequently worked in the Highway Patrol Division and in the Criminal Law Enforcement Division's Narcotics Service before becoming a Sergeant in the Special Crimes Service in 1997. Over the next four years, Alvarado applied for a Sergeant position with the Rangers four times but was unsuccessful on each attempt.

In late 2001, Alvarado applied to the Rangers for a fifth time. She was one of 146 applicants for ten available Sergeant positions in the division. As she had done on four previous occasions, Alvarado engaged in DPS's "promotion and selection" process, which consisted of two steps: a written examination covering technical job knowledge and related skills, and an appearance before a six-member Oral Examining Board (the "Board").[2] All 146 applicants were ranked according to their written exam scores, and the top forty scorers)) including Alvarado, whose score of 407.49 (out of a possible 500) tied for twenty-fifth place)) were selected to interview before the Board. Prior to the interviews, the Rangers conducted background investigations of each candidate. Ranger Captain Barry Caver ("Caver") assigned Ranger Sergeant Hank Whitman ("Whitman") to perform Alvarado's background investigation. The written results of the background investigations, along with a personnel file created by the Human Resources Bureau ("HR") for each candidate, were then

_____

[1] DPS has five major divisions: (1) the Driver License Division; (2) the Administration Division; (3) the Texas Highway Patrol Division; (4) the Criminal Law Enforcement Division, which consists of the three separate Services of Special Crimes, Narcotics, and Motor Vehicle Theft; and (5) the Texas Rangers Division.

[2] DPS regulations require that the Board be comprised of three members from the division with the vacancy (in this case, the Rangers Division) and three members from other divisions or the DPS Director's staff. The regulations further provide that the Board must include at least one African-American, one Hispanic, and one female, and that the supervisor of the open position should not serve on the Board unless no other alternative exists.

submitted to the Board. During the interviews, the Board members asked each candidate the same core questions, which had been drafted by the Board members and approved by HR in advance. In addition, the Board members were authorized to ask follow-up and candidate-specific questions. The Board members were instructed to evaluate each candidate on a scale of 0 to 500, with the "objective being to identify those who are the best qualified and to distinguish them by the rating" given.

Immediately following Alvarado's appearance before the Board, each Board member independently scored her interview as follows:

| | |
|---|---|
| Ranger Captain Caver | 300 |
| Cleatis Buckaloo, Ranger Captain | 390 |
| Norris Akin, Ranger Lieutenant | 345 |
| Jose Morales, Motor Vehicle Theft Service Lieutenant | 345 |
| Roger Millican, Highway Patrol Sergeant | 325 |
| Rhonda Perry, Narcotics Sergeant | 375 |

The Board members' score sheets were forwarded to HR, where the high and low scores were eliminated and the remaining scores were averaged to reach a Board score of 347.5 and an interview ranking of twenty-ninth. The Board score was combined with Alvarado's written exam score, as well as her service and college education points, for a final cumulative score of 779.99. When the candidates were ranked according to their cumulative scores, Alvarado placed twenty-ninth. The top ten candidates, all of whom were male, were then offered the Ranger Sergeant positions.

When Alvarado did not receive an appointment to the Rangers, she brought the instant action,

claiming that the Rangers had denied her a position on account of her sex in violation of Title VII.[3]

DPS moved for summary judgment, which the district court granted upon finding that Alvarado had

failed to establish a *prima facie* case of sex discrimination. Specifically, the district court determined

that Alvarado could not establish that she suffered an adverse employment action because a move

from her current Sergeant position with Special Crimes to a Sergeant position with the Rangers

would have been a purely lateral transfer, not a promotion. The court further found that "even

disregarding that [the position Alvarado sought] is a transfer, there is no indication that there is

anything inherently discriminatory in the process nor that Sgt. Alvarado has been discriminated

against." On appeal, Alvarado argues that the district court erred in granting summary judgment for

DPS because: (1) she adduced evidence sufficient to allow a reasonable trier of fact to find that the

denial of a position with the Rangers was the denial of a promotion and, hence, constituted an adverse

employment action; (2) DPS failed to provide a legally sufficient, legitimate, nondiscriminatory reason

for her non-selection; and (3) even if DPS had satisfied its burden of production, she produced

evidence sufficient for a reasonable jury to find that DPS's reason was pretextual and the denial of

an appointment to the Rangers was motivated by her sex.

II

We review the district court's grant of summary judgment *de novo*, applying the same legal

standard as the district court. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004).

Summary judgment is appropriate when the evidence "show[s] that there is no genuine issue as to any

---

[3] Alvarado also asserted several other claims, including claims of national origin discrimination, retaliation, and violations of 42 U.S.C. §§ 1981 and 1983, as well as claims of sex discrimination in connection with her four prior attempts to become a Ranger. The district court dismissed all of those claims on various grounds, and Alvarado does not challenge those dismissals on appeal.

material fact and that the moving party is entitled to a judgment as a matter of law." FED R. CIV. P. 56(c). We review all facts in the light most favorable to Alvarado. *Rachid*, 376 F.3d at 308.

III

Title VII proscribes an employer from discharging or otherwise discriminating against any individual because of that individual's sex. 42 U.S.C. § 2000e-2(a)(1). "The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) (internal quotation marks and citations omitted). Intentional discrimination can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Because Alvarado presents no direct evidence of discrimination, her claim is analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973). *Id.* Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a *prima facie* case. *Id.* The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Rachid*, 376 F.3d at 312.

A

To establish a *prima facie* case of sex discrimination under Title VII, the parties agree that Alvarado was required to show: (1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably. *See Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006); *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). The district court determined that Alvarado could not make out the third element of her *prima facie* case because the evidence established, as a matter of law, that the position she sought with the Rangers would have been a purely lateral transfer; therefore, the decision not to transfer her to the Rangers was not an adverse employment action within the meaning of Title VII.[4]

It is well established that the denial of a purely lateral transfer is not an adverse employment action redressible under Title VII. *See Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) ("Refusing an employee's request for a purely lateral transfer does not qualify as an ultimate employment decision [actionable under Title VII]."). It is equally well established, however, that the denial of a promotion *is* an actionable adverse employment action. *See, e.g.*, *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.") (internal quotation marks and citation omitted). Alvarado contends that the summary judgment record is replete with evidence indicating that her non-selection to the Rangers was the denial of a promotion, not merely the denial of a lateral transfer. DPS responds that Alvarado's claim rests on the mere fact that she finds the thought of being a Ranger more alluring than her current position and contends that she has come

---

[4] It is undisputed that Alvarado satisfied the remaining three elements of her *prima facie* case.

forward with no objective evidence that a move to the Rangers would have been a promotion.

Although we have never spoken precisely on what distinguishes a purely lateral transfer from a promotion, we have determined on several occasions when a transfer was the equivalent of a demotion and, hence, qualified as an adverse employment action. In *Click v. Copeland*, 970 F.2d 106 (5th Cir. 1992), for example, we held that the transfers of two deputy sheriffs from the law enforcement division to positions as jail guards could be considered demotions, even though the transfers were not accompanied by reductions in salary, because there was evidence that: (1) the jail guard positions were less interesting and less prestigious than the law enforcement positions; (2) "everybody" viewed a transfer from detention to law enforcement as a promotion and such transfers were rarely appealed, unlike transfers from law enforcement to detention, which few people requested and which were often appealed; and (3) there was a general preference for law enforcement positions, as "all" jail guards would like to be doing law enforcement work. *Click*, 970 F.2d at 109.[5] Similarly, in *Forsyth v. City of Dallas*, 91 F.3d 769 (5th Cir. 1996), we recognized as demotions the transfers of two police officers from the intelligence unit to night uniformed patrol positions, given that the patrol positions involved less prestige, less favorable working hours, and less interesting work, and officers had been transferred to patrol positions in the past as a form of discipline. *Forsyth*, 91 F.3d at 774. And in *Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999), we upheld the jury's determination that the transfer of a police officer from an elite horse-mounted division to a teaching post at the policy academy was an adverse employment action because the move from the "elite"

_____

[5] Although we also noted in *Click* that the plaintiffs lost seniority rights with their transfers, we did so after we had already determined that the transfers could be considered demotions. *See Click*, 970 F.2d at 110. Thus, contrary to the district court's suggestion in this case, our conclusion in *Click* that the plaintiffs' transfers could be considered demotions did not turn on the fact that the transfers caused the plaintiffs to lose seniority rights.

Mounted Patrol Division to the "less prestigious" teaching post could have been viewed, objectively, as a demotion. *Sharp*, 164 F.3d at 928, 933.[6]

Thus, "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse) ) such as being less prestigious or less interesting or providing less room for advancement." *Id.* at 933 (citing *Forsyth*, 91 F.3d at 774; *Click*, 970 F.2d at 109); *see also Serna*, 244 F.3d at 483 ("A transfer, even without an accompanying cut in pay or other tangible benefits, may constitute an adverse employment action . . . ."); *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) ("In a Title

---

[6] By contrast, in *Serna v. City of San Antonio*, 244 F.3d 479 (5th Cir. 2001), we concluded that the evidence was insufficient to establish that the transfer of an officer from the Downtown Foot and Bike Patrol Unit to a regular patrol unit in another part of San Antonio was a demotion. *Serna*, 244 F.3d at 483-85. Although "the evidence at trial tended to show . . . that the Downtown Foot and Bike Patrol Unit was more prestigious than other patrol units and that some officers preferred its tactics to those of other patrol units," we nevertheless held that "[t]here was no evidence to suggest that a transfer to a regular patrol unit was generally considered to be a demotion or any kind of punishment." *Id.* at 484. In so holding, we focused on the following facts: (1) Serna suffered no loss of pay or benefits; (2) there was no objective evidence that his promotional opportunities were hampered by the transfer; (3) most of his fellow officers worked in regular patrol units and spent substantial portions of their careers in such units, and there was no evidence that the regular patrol unit was an objectively worse assignment; and (4) "all Serna's testimony established was that he felt stigmatized and injured by his transfer," but this negative perception of the move was purely subjective and not shared by other officers. *Id.* at 484-85. We further noted that unlike the officers in *Click* and *Forsyth*, Serna presented no evidence that "regular patrol assignments were considered punishment or even that they were considered less desirable generally" or that "officers were clamoring to get out of regular patrol assignments." *Id.* at 485. Thus, the totality of the circumstances in *Serna* did not support a finding that the transfer was the objective equivalent of a demotion.

Although *Click*, *Forsyth*, *Sharp*, and *Serna* all involved claims of First Amendment retaliation under 42 U.S.C. § 1983, rather than claims of discrimination under Title VII, they are nevertheless relevant because the definition of "adverse employment action" under § 1983, like Title VII's definition of "adverse employment action," includes demotions. *See Sharp*, 164 F.3d at 933 n.21 (recognizing that the definition of an adverse employment action may be broader under § 1983 than under Title VII, but explaining that the potential differences between the definitions were immaterial to the analysis because a demotion qualifies as an adverse employment action under both statutes).

VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility.").[7] Whether the new position is worse is an objective inquiry. *See Pegram*, 361 F.3d at 283 (citing cases). "[A] plaintiff's subjective perception that a demotion has occurred is not enough." *Forsyth*, 91 F.3d at 774; *see also Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 n.8 (5th Cir. 2001) ("[T]he focus is on the objective qualities of the positions, rather than an employee's subjective preference for one position over another. That subjective preference, alone, is an insufficient basis for finding an adverse employment action."); *Serna*, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused [him] harm . . . .").

---

[7] DPS argues that the fact that a transfer entails a loss of prestige cannot render it an adverse employment action. In support of this argument, DPS cites *Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004), where we stated: "Circuit precedent establishes that in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action." *Pegram*, 361 F.3d at 283. In *Pegram*, however, the issue before us was whether the plaintiff's *subjective* belief that his Total Plant Account Manager position was more desirable and prestigious than the Service Account Manager position to which he had been transferred was sufficient to render the "unwanted transfer" an adverse employment action. *See id.* at 277, 283. Thus, *Pegram* stands for the proposition that a plaintiff must "assert more than a loss of *subjective* prestige," *id.* at 284 (emphasis added); it does not, as DPS suggests, mean that a plaintiff cannot rely on a loss of *objective* prestige as evidence that a transfer was really a demotion. *Cf. Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1452 n.19 (11th Cir. 1998) ("[W]e believe that loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test [for whether a transfer is an adverse employment action].").

DPS also relies on *Serna*, but it is not to the contrary. *Serna* does not hold that a loss of prestige is never relevant to the question of whether a transfer is the objective equivalent of a demotion. Rather, the objective evidence in *Serna* that the Downtown Foot and Bike Patrol was considered a prestigious unit, when considered in light of the contrary evidence indicating that a move from that unit to a regular unit was not a demotion, was simply insufficient to establish that the plaintiff suffered anything more than a lateral transfer on the facts of that case. *See Serna*, 244 F.3d at 484-85.

Adapting this analysis to the promotion context, we conclude that the denial of a transfer *may* be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action. *See Sharp*, 164 F.3d at 933. In determining whether the new position is objectively better, a number of factors may be relevant, including whether the position: entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious.[8] This is an objective inquiry; neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion. *See Pegram*, 361 F.3d at 283.

In this case, there was evidence sufficient to raise a genuine issue of material fact on whether Alvarado's non-selection to the Rangers was an adverse employment action. Viewed in the light

---

[8] *See, e.g.*, *Pegram*, 361 F.3d at 284 (identifying as a relevant factor differences in compensation); *Serna*, 244 F.3d at 484-85 (differences in pay and benefits; impact of the move on opportunities for advancement; whether the move is generally viewed as a demotion); *Sharp*, 164 F.3d at 933 (differences in prestige; impact of the move on opportunities for advancement; whether an organization is elite); *Forsyth*, 91 F.3d at 774 (whether job duties are more interesting; differences in prestige; whether the position is generally more sought after); *Click*, 970 F.2d at 110 (whether job duties are more interesting; differences in prestige; general perception of the move as a demotion); *see also Hinson*, 231 F.3d at 829 (differences in pay, prestige, and level of responsibility); *Stewart v. Ashcroft*, 352 F.3d 422, 426-27 (D.C. Cir. 2003) (impact of the move on opportunities for advancement; differences in supervisory responsibilities).

This list is not meant to be exhaustive, as there may well be other relevant objective factors, and no single factor is determinative. Rather, whether a transfer could be viewed as the objective equivalent of a promotion depends upon the totality of the circumstances in the particular case.

most favorable to Alvarado, there is summary judgment evidence indicating that: (1) the Rangers are an elite unit within DPS and have a unique and illustrious history; (2) an appointment to the Rangers is, according to DPS, "one of the most competitive goals to which a law enforcement officer may aspire"; (3) the "promotion and selection" process is complex and rigorous; (4) the competition to become a Ranger is "fierce," as evidenced by the large number of applicants for the few available positions, and is steeper than the competition for positions with any of DPS's other divisions; (5) the minimum qualifications for becoming a Ranger Sergeant are higher than the minimum qualifications for becoming a Sergeant with Special Crimes; (6) the Rangers work under less supervision and have greater job responsibilities, including being the primary investigators of homicides and handling other major "high-profile" and "sensitive" cases; (7) although DPS regulations do not officially classify Ranger appointments as promotions because they do not entail an increase in pay, receiving an appointment to the Rangers is generally viewed within DPS as a promotion; and (8) newly appointed Rangers are honored at a special "promotional ceremony" in Austin. Thus, contrary to DPS's assertion, Alvarado is not relying on a mere loss of subjective prestige or some idiosyncratic preference for being a Ranger. This is not a case where a supervisor has denied an employee's request, unsolicited by the employer, for a transfer to another position with the employer for reasons personal to the employee, such as working hours or a work location that the employee perceives as preferable to those of her current position. Rather, this is a case where the employer was actively seeking candidates for ten positions in an elite law enforcement unit and devised a complex selection process for choosing among the 146 applicants clamoring for those spots. The complexity of the selection process and the level of competition for the limited number of positions with the Rangers are significant objective facts relevant to the question of whether the denial of a position with the

-11-

Rangers was the equivalent of the denial of a promotion.

Because Alvarado has produced objective summary judgment evidence indicating that her non-selection to the Rangers was the denial of a promotion, we conclude that a reasonable juror could find that she suffered an adverse employment action. Accordingly, the district court erred in granting summary judgment to DPS on the ground that Alvarado failed to make a *prima facie* showing of sex discrimination.[9]

B

Because Alvarado raised genuine issues of material fact on each element of her *prima facie* case, DPS was required to produce evidence tending to show that it had a legitimate, nondiscriminatory reason for not appointing her to the Rangers in order to meet its burden under the second step of the *McDonnell Douglas* analysis. *See Burdine*, 450 U.S. at 254-56; *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004). Alvarado contends that DPS's proffered reason for her non-selection))her failure to score among the top ten candidates in the promotion and selection process))is insufficient to satisfy this burden.

Alvarado does not dispute that her final score in the promotion and selection process put her in twenty-ninth place or that the candidates with the top ten scores were selected. Nor does she assert that a candidate's performance in the promotion and selection process could never be a

_____

[9] To the extent the district court, in addition to finding that Alvarado failed to show an adverse employment action, also found that Alvarado failed to create a fact issue on the ultimate issue of sex discrimination, it is undisputed that the district court made this determination without engaging in the second and third steps of the *McDonnell Douglas* analysis, which was improper. Because the grant of summary judgment may nevertheless have been appropriate if DPS came forward with a legally sufficient, legitimate, nondiscriminatory reason for Alvarado's non-selection and Alvarado failed to show that the reason was pretextual, we find it necessary to consider the parties' arguments on those issues.

legitimate, nondiscriminatory reason for not selecting the candidate for the Rangers. Instead, Alvarado contends that DPS has offered no evidence that her interview score))which she claims was the driving force behind her overall standing in the promotion and selection process rankings))was determined by sex-neutral factors or characteristics; thus, Alvarado argues, DPS's ostensibly nondiscriminatory reason for her non-selection is really the sort of nonspecific, content-less explanation that this court has found insufficient to satisfy an employer's burden of production. *See Patrick*, 394 F.3d at 316-17 (concluding that the employer's proffered reason for failing to promote an employee))that the employee was "not sufficiently suited" for the position))was insufficient to satisfy the employer's burden of production because the employer offered no explanation or evidence as to what made the employee "not sufficiently suited" for the position).

The summary judgment evidence bears out Alvarado's contention that a candidate's interview score was a determinative factor in whether the candidate landed in the top ten in the final rankings. Of the ten candidates ultimately appointed to the Rangers, nine scored in the top ten in the oral interviews (the other candidate scored eleventh), while only four scored in the top ten on the written exam (the other six candidates scored twelfth, seventeenth (tie), seventeenth (tie), twenty-seventh, thirty-first, and thirty-third); the candidates with the second, fifth, and sixth highest scores on the written exam found themselves outside the top ten. Furthermore, three of the men in the top ten actually scored worse than Alvarado on the written exam. Thus, the summary judgment evidence indicates that the decision as to who made the Rangers was heavily influenced by the Board members' subjective evaluations of the candidates' performances in the oral interviews.

An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason

for the candidate's non-selection. *See id.* at 317 (recognizing that *McDonnell Douglas* does not preclude an employer from relying on subjective reasons for its personnel decisions); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation."). Such a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment. *See Burdine*, 450 U.S. at 258; *Patrick*, 394 F.3d at 316-17; *see also Chapman*, 229 F.3d at 1034 ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."); *EEOC v. Target Corp.*, 460 F.3d 946, 957-58 (7th Cir. 2006) (agreeing with the Eleventh Circuit that "an employer must articulate reasonably specific facts that explain how it formed its [subjective] opinion of the applicant in order to meet its burden under *Burdine*"). DPS has failed to do so here.

Although the evidence shows that Alvarado received interview scores of 300, 325, 345, 345, 375, and 390, for a cumulative score of 347.5, DPS has offered neither an explanation nor evidence of how or why the interviewers arrived at those scores. Nor has DPS provided any evidence of why the Board rated the other candidates, particularly the ten men who were selected for the Rangers, higher than Alvarado. Alvarado's score sheets contain no notes or comments on her interview performance, and DPS has not pointed to any deposition testimony by the Board members that would shed light on why they scored Alvarado and the other candidates the way they did. Without some indication of the factual basis or specific reasons for Alvarado's interview score, the score says nothing about whether her non-selection for the Rangers was the product of intentional sex

discrimination. Instead, the score "is at least as consistent with discriminatory intent as it is with nondiscriminatory intent" because Alvarado may well have received the relatively low interview score on account of her sex. *See Patrick*, 394 F.3d at 317. Because DPS has pointed to no evidence in the summary judgment record that clarifies or expands upon why Alvarado received the relatively low interview score, DPS's ostensibly legitimate, nondiscriminatory reason for Alvarado's non-selection) ) her performance in the promotion and selection process) ) is insufficient to satisfy DPS's burden of production. *See, e.g.*, *Target*, 460 F.3d at 958-59 (holding that the company's stated reason for not hiring one of the plaintiffs) ) its determination, based upon the plaintiff's interview, that he did not meet the requirements for the position) ) was insufficient to satisfy its burden of production because the company failed to articulate what criteria informed its decision and what requirements the plaintiff did not meet); *cf. Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1106 (11th Cir. 2001) (holding that the employer met its burden of production because its proffered reason for not hiring the plaintiff) ) his poor interview) ) was supported by reasonably clear and specific explanations from the interviewers as to what made the plaintiff's interview "poor"); *Chapman*, 229 F.3d at 1035 (same).

Our conclusion that DPS has failed to satisfy its burden of production is not an indictment of the promotion and selection process itself. We do not doubt the prudence of the promotion and selection process as a method of identifying those best suited to work as Rangers, and we agree with the district court that nothing in the summary judgment evidence indicates that the process is inherently discriminatory. We simply hold that, given DPS's failure to evidence the grounds for the Board's scoring of Alvarado and the other candidates in the second, subjective stage of the promotion and selection process, DPS has failed to proffer a reason for Alvarado's non-selection that, if

believed, would allow the jury to conclude that Alvarado's non-selection was not the result of intentional sex discrimination.

To the extent DPS asserts on appeal that Alvarado did not receive an appointment to the Rangers because she was not the among the best qualified candidates, this assertion is also insufficient to satisfy DPS's burden of production. DPS has pointed to no evidence of the qualifications of the ten candidates selected to join the Rangers; rather, the only information about those candidates cited by DPS are their scores in the promotion and selection process. Without evidence of the candidates' relative qualifications, the mere assertion that DPS hired the best qualified candidates is insufficient to satisfy its burden of production, as it does not afford Alvarado "a full and fair opportunity to demonstrate pretext." *See Burdine*, 450 U.S. at 254-56 & n.9 ("[T]he defendant must clearly set forth, *through the introduction of admissible evidence*, the reasons for the plaintiff's rejection.") (emphasis added); *see also Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) ("A defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant, but must articulate specific reasons for that applicant's qualifications, such as seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination of such criteria.") (internal quotation marks and citation omitted).

Because DPS has not satisfied its burden of producing evidence tending to show that it had a legitimate, nondiscriminatory reason for not appointing Alvarado to the Rangers, we do not reach the question of whether Alvarado could demonstrate pretext or otherwise show that her failure to receive an appointment to the Rangers was actually motivated by sex discrimination. Alvarado's *prima facie* case "pretermits summary judgment dismissal of her action, leaving the ultimate question

-16-

of discriminatory animus to be determined by the trier of fact." *Patrick*, 394 F.3d at 320.

IV

For the foregoing reasons, we reverse the district court's grant of DPS's motion for summary judgment on Alvarado's Title VII claim and remand this case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.