# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 29, 2011

Lyle W. Cayce
Clerk

No. 10-10773

CARL MANORA,

        Plaintiff - Appellant

v.

PATRICK R. DONAHOE, as Postmaster of United States Postal Service,

        Defendant - Appellee

Appeal from the United States District Court
for the Northen District of Texas
USDC No. 3:07-CV-1747

Before SMITH, BENAVIDES, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Carl Manora, an African-American, lost his position as an audit manager for the United States Postal Service ("USPS") Office of Inspector General ("OIG") in a competitive reselection process. Manora claims that he was not reselected for the position because of race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964. The district court

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 10-10773

granted USPS's[1] motion for summary judgment, finding that USPS articulated legitimate reasons for not reselecting Manora, and that Manora failed to present sufficient evidence that those reasons were a mere pretext for discrimination. For the following reasons, we affirm.

I

OIG investigates and audits USPS's operations to identify and eliminate fraud and abuse. Manora began working as an auditor for OIG in June 1997. By 2003, Manora had worked his way up to a "team leader" position with OIG's Network Operations and Logistics ("NOL") directorate in Dallas, Texas. In May 2003, during a reorganization of OIG, Manora was promoted to an "audit manager" position with the same directorate. At the time, Joseph Oliva, the audit director of the NOL directorate, expressed "concerns over [Manora's] management style." Oliva would have "preferred a manager who was more 'hands-on.'"

In the summer of 2004, a recently installed Inspector General required all incumbent audit managers to reapply for their positions in a competitive reselection process. The incumbent audit managers apparently had been appointed without input from their respective audit directors, and the Inspector General was concerned that the appointments had not been open and competitive.[2] On August 24, 2004, OIG issued an "internal vacancy

---

[1] Patrick Donahoe is the Postmaster General of USPS and the named defendant in this action. We refer to USPS and not Donahoe for clarity.

[2] Manora himself testified that the incumbent audit managers had received their positions by "submit[ting] their names for positions or jobs that they would rather work in." There were "[n]o vacancy announcements," and "no one" submitted a specific application for a position as an audit manager.

## No. 10-10773

announcement" identifying forty-two available audit manager positions with fourteen different directorates in locations across the country. The positions were open to any qualified OIG employee and were filled pursuant to a "proposed plan for audit manager recompetition" (the "Recompetition Plan"). There is no allegation that the reselection process itself was discriminatory or otherwise improper.

Under the Recompetition Plan, a "reviewing panel" of audit directors assigned candidates a score of one to three in eight different categories.[3] A list of candidates and their scores was then distributed to the audit directors of each directorate. The audit directors interviewed the candidates using a standard list of questions. Finally, each audit director, acting as the "selecting official" for his or her directorate, made final selection decisions. OIG advised the selecting officials "to use their best judgment when making selections considering the education, background and experience of the candidate and their individual assessment of which candidate is best suited for the position."

Manora participated in the reselection process and applied for a total of six audit manager positions with two different directorates in three locations. Specifically, Manora applied for positions with the NOL directorate and the Delivery and Retail ("DR") directorate, each of which offered one position in Atlanta, Georgia; Arlington, Virginia; and Dallas, Texas. Oliva, Manora's direct

---

[3] Specifically, candidates were scored on four "desirable qualifications" and four "evaluation factors." The desirable qualifications included: (1) professional certifications; (2) previous supervisory experience in audits; (3) experience in leading complex, multi-site audits; and (4) specialized auditing experience. The evaluation factors included: (1) knowledge of accounting and auditing theory, concepts, and standards; (2) ability to provide the full range of technical and administrative supervision; (3) ability to liaison with auditees and other interested parties; and (4) ability to develop and review audit reports.

## No. 10-10773

supervisor at the time, was the selecting official for the three NOL positions. Debra Pettitt, the audit director of the DR directorate, was the selecting official for the three DR positions.

Manora scored highly in the reviewing panel's assessment and was among the top candidates for each position. There is no dispute in this case that Manora is at least qualified to be an audit manager. Nonetheless, Manora was not selected for an audit manager position during the reselection process. Oliva instead selected three Caucasians (two males and one female), while Pettitt selected three African-American women. Relevant here, Oliva selected Vicky Walker (a Caucasian female) for the NOL position in Dallas and Jerry Werking (a Caucasian male) for the NOL position in Arlington. Oliva earlier had written a recommendation letter for Walker to use in the reselection process.[4] The letter asserts, inter alia, that Walker "is an outstanding leader" and "widely regarded as one of OIG's most effective managers." According to Oliva, he wrote the recommendation letter because Walker "was the only person to request a recommendation from me at that time," and "her role supervising audits qualified her for the position because that is what she was doing."

After the reselection process, Manora was assigned, at his request, to an auditor position with the DR directorate in Dallas. Manora did not think it would be a "good idea" to continue working for Walker in the NOL directorate because Walker had been Manora's subordinate. Approximately one year later, in August 2005, Manora was promoted to an audit manager position in the DR directorate in Dallas.

---

[4] Walker applied for a total of four audit manager positions with the NOL, DR, Network Operations Processing ("NOP"), and Field Operations ("FO") directorates in Dallas.

No. 10-10773

On January 18, 2005, Manora filed a complaint with the Equal Employment Office alleging that USPS discriminated against him on the basis of race and sex. An administrative law judge ("ALJ") dismissed the complaint. Manora appealed to the Office of Federal Operations, which upheld the ALJ's decision. Manora filed this action on October 16, 2007, asserting race and sex discrimination claims under Title VII of the Civil Rights Act of 1964. The district court granted USPS's motion for summary judgment, finding that USPS had articulated legitimate reasons for not reselecting Manora, and that Manora had not presented sufficient evidence that those reasons were a mere pretext for discrimination. Manora appealed.

Although Manora initially pursued claims with respect to all six audit manager positions for which he was not selected, Manora has expressly limited the issues on appeal to his "non-selection from the NOL Dallas, Texas and Arlington[,] VA directorate . . . under the leadership of Joseph Oliva." Accordingly, our review is limited to these two alleged instances of discrimination, and Manora has waived any arguments with respect to other alleged instances of discrimination.[5] *See, e.g.*, *Matthews v. Remington Arms Co., Inc.*, 641 F.3d 635, 641 (5th Cir. 2011) (finding argument made to district court but not briefed on appeal waived); FED. R. APP. P. 28(a)(9)(A) (requiring appellant's brief to contain appellant's "contentions and the reasons for them").

II

We review summary judgment de novo, using the same standards as the district court. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir.

_____

[5] Manora also has not briefed on appeal any other alleged instances of discrimination.

No. 10-10773

2010). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view the evidence and draw reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

III

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In Title VII cases, the inquiry is "whether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quotation and citation omitted); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).

At summary judgment, we analyze Title VII claims under the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007). Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination.[6] *Alvarado*, 492 F.3d at 611. If the plaintiff establishes a prima facie case, an inference of intentional discrimination arises and the burden of production shifts

---

[6] To establish a prima facie case of discrimination under Title VII, a plaintiff must show: (1) he is a member of a protected class; (2) he sought and was qualified for the position in question; (3) he suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably. *Alvarado*, 492 F.3d at 611.

No. 10-10773

to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* The employer's reason may be subjective, as long as it is legitimate and has a "clear and reasonably specific" basis. *Id.* at 616; *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 882 (5th Cir. 2003). If the employer carries its burden of production, the burden then shifts back to the plaintiff to offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's proffered reason is not true and is instead a pretext for discrimination, or (2) the employer's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Alvarado*, 492 F.3d at 611 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

On appeal, USPS does not contest that Manora has established a prima facie case of discrimination. Instead, USPS asserts that it is entitled to summary judgment because it has articulated legitimate reasons for not reselecting Manora, and Manora has not presented sufficient evidence for a reasonable jury to conclude that those reasons were a mere pretext for discrimination.

A

USPS has articulated legitimate, nondiscriminatory reasons for not reselecting Manora for the Dallas and Arlington audit manager positions. USPS asserts that it did not reselect Manora primarily because of his "passive" and "standoffish" management style. According to Oliva, Manora "preferred to motivate his employees by coaching and mentoring rather than rolling up his sleeves." But because Oliva's audit teams tended to be small, Oliva needed "player-coaches" who were more "hands-on" and "directly" and "fully engaged"

No. 10-10773

in the audit process.  Oliva thought that Manora's "team could have used his more active involvement with their work."

Oliva's assessment of Manora's management style was based on reasonably specific observations between 2000 and 2004.  For example, during one meeting with USPS managers involving a "contentious" audit, Oliva recalls that Manora simply "observed the discussion with minimal participation," while Walker was "actively discussing the facts and details and defending the audit findings."  Oliva thought Manora "just didn't engage at the level I thought was necessary."  Similarly, Oliva states that he "would call [Manora] to get information from time to time," but Manora "would frequently refer me to [Walker] for the details."  This "had the effect of making [Walker] appear to be more knowledgeable and better informed than [Manora]."  To be sure, Oliva thought that Manora was "qualified and contributed."  Oliva just thought that Walker "was more engaged and contributed more."  Oliva ultimately selected Walker for the Dallas audit manager position based on an "evaluation of which individual I thought my directorate could afford to lose least."

In addition to Manora's passive management style, Oliva asserts that he selected Jerry Werking for the Arlington audit manager position because Werking was more qualified than Manora.  There is no dispute that Werking has extensive experience leading and supervising audits. Moreover, Werking, unlike Manora, is a Certified Public Accountant ("CPA").  And although both Werking and Manora have received a Masters in Business Administration ("MBA"), Werking's MBA is in the specific field of accounting.  Oliva reasoned that "since [Werking's] education, certifications and performance conducting audits was

8

No. 10-10773

superior to [Manora's], I could not justify the cost of moving [Manora] from Texas to Virginia."

Management style and professional qualifications generally are legitimate, nondiscriminatory reasons for selecting one manager over another. *See, e.g.*, *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898-99 (5th Cir. 2002) (recognizing that management style is a legitimate, nondiscriminatory reason for an employment action); *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243-44 (11th Cir. 2010); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 766 (7th Cir. 2001). Here, there is no dispute that an OIG audit manager must be "highly motivated," "provide the full range of technical and administrative supervision to staff," and "maintain effective liaison with auditees, audit organizations, and other interested parties." Selecting Walker on the basis of her active management style was legitimate in light of the demands of this position. Similarly, an OIG audit manager must have a thorough "knowledge of accounting" and be able to "develop and review written audit reports." A CPA certification and an MBA in accounting demonstrate a high level of training in these areas. Manora has not pointed to any reason why an active management style, a CPA, and a specialized MBA were not legitimate considerations in USPS's reselection process, and we conclude that they were.

B

Because USPS has articulated legitimate, nondiscriminatory reasons for not reselecting Manora, the burden now shifts to Manora to present sufficient evidence for a reasonable jury to conclude that USPS's reasons were a mere pretext for discrimination. A plaintiff may establish pretext by showing that the employer's proffered reasons are "false or 'unworthy of credence.'" *Laxton v. Gap*

9

*Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* A plaintiff also may establish pretext by showing that he was "clearly better qualified" for the relevant position than the selected candidate. *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002). To meet this standard, the employee must demonstrate that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999). In other words, the disparity in qualifications must be so wide "that no reasonable employer would have made the same decision." *Id.* at 282. Better education, work experience, and longer tenure with a company do not necessarily establish that an applicant is clearly better qualified for a position. *Price*, 283 F.3d at 723. Ultimately, the law requires only that the employer's decision is "somewhere within the realm of reason." *Deines*, 164 F.3d at 282. This is because the judicial system is not as well suited to evaluate professional qualifications as those who have trained and worked for years in the relevant field of endeavor. *Id.* at 280.

On appeal, Manora does not dispute that an active management style is better suited to the demands of an OIG audit manager. Nonetheless, Manora contends that he is "clearly better qualified" than Walker and Werking for an audit manager position. We find that the record does not support Manora's contention.

Manora emphasizes that he was in fact an audit manager with OIG for sixteen months, while "Walker was never an audit manager nor did she have

audit manager functions during any of the 2000-2004 period." There are several holes in this argument. For one, although Walker was not an audit manager at OIG from 2000-2004, she was an audit manager at the Air Force Audit Agency from 1997-2000. At the Air Force Audit Agency, Walker was responsible for "planning, coordinating, summarizing and reporting on the accuracy of Air Force Financial Statements, real property assets, valued at over $40 billion." Thus, it appears that Walker gained substantial experience managing audits even before joining OIG. Moreover, the record reveals that Walker was a "team leader" at OIG. Manora testified at his deposition that "the team leader and audit manager's jobs are pretty much one and the same; just a changed name." Both positions, according to Manora, are "supervisory-type positions." Thus, although Walker may not have been an OIG audit manager in name, it appears that she did perform similar functions in practice. Lastly, Manora himself acknowledged that Walker was a competent manager. Manora testified that Walker was the "only one" of his subordinates who "had detailed audit experience that could actually do an audit . . . by herself." Manora thus "assigned to [Walker] two or three other people," and Walker would "pretty much . . . do an audit with those people" while Manora took "another group." In short, contrary to Manora's assertions, the record indicates that Walker was a capable auditor with substantial managerial experience.

Manora next points out that he has an MBA while Walker has only a bachelor's degree. Better education, however, does not necessarily establish that an applicant is clearly better qualified for a particular position. *Price*, 283 F.3d at 723. The record reflects that Walker is well qualified in accounting. She has a bachelor's degree in accounting and, like Manora, is a Certified

Government Financial Manager ("CGFM").   She also has received several professional awards, including the Air Force Audit Agency's Distinguished Audit Manager Award and OIG's Exceptional Performance Award.  In light of Walker's substantial managerial experience and training, any disparity between Manora's and Walker's qualifications is not so wide that no reasonable employer would have selected Walker over Manora.

Similarly, Manora asserts that he has two professional certifications (i.e., CGFM and Certified Fraud Examiner ("CFE")), while Werking has only one (i.e., CPA).  We have no doubt that a CGFM and a CFE are worthy certifications, but simply tallying them up is not probative of discriminatory intent.  Nothing in the record suggests that a CGFM and a CFE together are "clearly better" than a CPA.   Accordingly, Oliva's preference for Werking's CPA was not so unreasonable that it must have been a pretext for discrimination.  *See Deines*, 164 F.3d at 282 (finding that even if the employer "did not properly evaluate the qualifications of the respective candidates," and even if the plaintiff "was the best qualified candidate," the plaintiff "still would not have proved his case" unless the qualifications were "so widely disparate that no reasonable employer would have made the same decision").

Finally, Manora suggests that Oliva's stated reasons for hiring Walker are "unworthy of credence" because Oliva was "biased."  Manora asserts that Oliva initially objected to Manora's appointment to an audit manager position in 2003 and later wrote a recommendation letter for Walker during the reselection process.  This evidence, however, is entirely consistent with Oliva's stated (and legitimate) reasons for not reselecting Manora.  Oliva objected to Manora's appointment in 2003 because Oliva "had concerns over [Manora's] management

style" and "preferred a manager who was more 'hands-on.'" Moreover, Oliva's recommendation letter asserts that Walker is "an outstanding leader" and "widely regarded as one of the OIG's most effective managers." These are the same legitimate, nondiscriminatory reasons that Oliva now gives for selecting Walker over Manora. In other words, it may be that Oliva preferred Walker from the start of the reselection process, but there is no evidence that he preferred her for illegitimate or discriminatory reasons.

To summarize, USPS asserts that it selected Walker and Werking (and not Manora) for the Dallas and Arlington audit manager positions based on their particular management styles and professional qualifications. These are legitimate, nondiscriminatory reasons for USPS's employment action. Because Manora has not put forward any evidence that USPS's reasons were a mere pretext for discrimination, nor that discrimination was a motivating factor for USPS's employment action, USPS is entitled to summary judgment.

IV

For the reasons stated, summary judgment is AFFIRMED.