United States Court of Appeals,

Fifth Circuit.

No. 91-7245.

Henry BROWN, Plaintiff-Appellant,

v.

EAST MISSISSIPPI ELECTRIC POWER ASSOCIATION, Defendant-Appellee.

May 4, 1993.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, WISDOM and WIENER, Circuit Judges.

POLITZ, Chief Judge:

Henry Brown appeals an adverse judgment in his race discrimination suit against his employer, East Mississippi Electric Power Association (EMEPA). For the reasons assigned we reverse and render on liability and remand for consideration of remedy.

Background

After 20 years employment with EMEPA, Brown became the company's first African-American serviceman. Within a year he was given the option of returning to the line crew or dismissal. EMEPA contends that he resigned; Brown maintains that he was fired. EMEPA claims the adverse action was prompted by customer complaints; Brown attributes it to racial discrimination. After satisfying administrative prerequisites, Brown filed suit under Title VII of the Civil Rights Act of 1964, as amended.[1] The case was tried to the court, which found no discrimination. This appeal followed.

The incidents culminating in Brown's separation from EMEPA began in August 1988, when he received a written warning for "attitude and abusive manner" in dealing with customers. The triggering incident concerned service disconnection at the trailer residence of a Shirley May. Mrs. May and her husband Jerry were in the process of divorcing. She had moved out of the trailer and ordered service terminated; he wanted to keep the trailer but was unable to pay the notes and,

_____

[1] 42 U.S.C. § 2000e *et seq.*

according to his wife, had a "hot temper at the time."

Brown arrived on a Friday morning when Mr. May was home alone. May protested disconnection so Brown withdrew to call his supervisor, Leon Pippen, for further instructions. Pippen directed him to disconnect. When Brown returned in the afternoon Mrs. May also was at the trailer. Mr. May again protested but stopped after his wife interceded. According to Mrs. May's trial testimony, her husband was "very agitated, cussing, telling him he wasn't going to cut the power;" Brown "was just kind of standing by waiting for the friction to stop."

Mrs. May telephoned EMEPA the next business day to apologize for her husband's behavior; her message purportedly never reached EMEPA General Manager Emmett Murray. Murray, however, did receive a visit from an angry Mr. May. Claiming that Brown had cursed him, May threatened to kill Brown if he returned to the property. After consulting with Pippen and meeting with Brown, Murray suggested that Brown return to the line crew. Brown refused; Murray switched his service territory and warned him that another customer complaint would result in termination. Brown filed a charge of discrimination with the Equal Employment Opportunity Commission.

Murray met informally with Brown in March 1989 to discuss attitude problems. According to Murray, Brown's disgruntled attitude had prompted complaints from other employees and was carrying over into dealings with customers. Brown said the problem was not his attitude but rather his supervisor, Pippen. Although it is contested how explicit Brown was at this meeting, Brown knew that Pippen, who was white, referred to African-Americans as "niggers." He had overheard Pippen use this slur in conversation with other whites. Pippen had used it directly to him, threatening to answer "What do you want, nigger?" if Brown addressed him improperly over the radio.[2] At the time of the March meeting, Murray knew that Pippen had used such language. Murray, however, said he assumed that Pippen had stopped using the racial slur after he was reprimanded for such usage.

Brown's final "infraction" occurred on March 17, 1989 and involved a Bill McKinnon.

[2]Brown testified that Pippen was angered because he did not use the appellation "Mr." when addressing Pippen. The white servicemen likewise did not use the appellation but Pippen voiced no objection to them. Pippen insisted that Brown deliberately mispronounced his name.

According to McKinnon, Brown had backed up too fast in his driveway on a service call, spinning wheels and throwing gravel. When McKinnon objected, Brown allegedly told him not to be a "smart ass" and continued to argue with him. Brown denied that he had cursed or argued with McKinnon, testifying at trial that McKinnon had addressed him as "nigger."

McKinnon complained to Pippen, a long-time acquaintance, threatening that "something may happen" to Brown if he returned to McKinnon's property. Pippen reported the incident to Murray, who asked that McKinnon sign a written statement in the presence of a company attorney. McKinnon complied. Murray, Pippen, and assistant manager Wayne Henson spoke with Brown to elicit his side of the story.

After leaving the meeting, Brown maintains that McKinnon followed him to a truck stop, where Brown stopped to telephone his superiors. He reached Henson, informed him that McKinnon was following him, asked Henson if he knew what "kind of a character" McKinnon was, and offered to put someone on the telephone for corroboration. Henson declined. At trial, several witnesses testified that McKinnon's reputation for peacefulness and truthfulness was bad. These witnesses included a white EMEPA serviceman and a retired white EMEPA line foreman. Notwithstanding, Murray, Pippen, and Henson claimed that they were unaware of McKinnon's reputation when they decided Brown's fate.

Murray, Pippen, and Henson, all of whom were white, decided to reassign Brown from serviceman to a line crew. They so informed Brown at a meeting which Brown surreptitiously tape-recorded. Angered and upset by what he considered a demotion, Brown charged retaliation for his prior EEOC complaint. It was decided that Brown would take a two-week vacation. The parties dispute whether Brown resigned or was to consider taking the new work assignment during his time off. About a week later Murray wrote Brown, accepting his resignation. Brown telephoned to say he had not resigned but Murray refused to discuss the matter. Brown filed a second EEOC charge and, after receiving notices of right to sue with respect to this charge and his prior one, brought the instant suit.

Analysis

At the heart of this appeal is the significance of Pippen's routine use of the term "nigger." EMEPA would dismiss it as isolated remarks. Brown maintains that it is direct evidence of discrimination and that the district court consequently erred in failing to apply the *Price Waterhouse*[3] proof methodology.

When a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.[4] Direct evidence is evidence which, if believed, proves the fact without inference or presumption.[5] We conclude that Brown's evidence passes muster.

It is uncontroverted that Pippen used the term "nigger" both to refer to Brown in particular and to black persons in general. According to Kim Culpepper, a white serviceman, Pippen used the term "basically any time there was a reference to a black." Pippen testified that he stopped after Murray reprimanded him in August 1988 but Culpepper disagreed; he testified that he observed no change whatever.

Brown offered evidence of the following instances of racial remarks by Pippen. Thomas Hamner, a retired white line foreman, testified that Pippen had told him, "I had to dust my little nigger again today," with reference to Brown. Jimmy Gressett, a white right-of-way supervisor, testified that Pippen had said the same to him. Louvenia Ford, a black service clerk, complained to Murray in August 1988 after she overheard Pippen say "I haven't seen my little nigger friend this morning" and two cashiers told her Pippen had used the slur with reference to her. It was Ford's complaint that prompted Murray's reprimand of Pippen. In addition to the aforementioned threat to say "What do you want, nigger?" over the radio, Brown testified to overhearing Pippen, discussing a recent car accident, say "I felt like getting my gun and killing that nigger," and, talking with a white serviceman, "You should have hooked that power up for that nigger. You know how they are."

---

[3]*Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

[4]*Price Waterhouse, supra; Vaughn v. Edel,* 918 F.2d 517 (5th Cir.1990).

[5]*Burns v. Gadsden State Community College,* 908 F.2d 1512 (11th Cir.1990).

Pippen's routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions. Pippen's use of the racial epithet was not, as EMEPA suggests, an innocent habit. Unlike certain age-related comments which we have found too vague to constitute evidence of discrimination,[6] the term "nigger" is a universally recognized opprobrium, stigmatizing African-Americans because of their race. That Pippen usually was circumspect in using the term in the presence of African-Americans underscores that he knew it was insulting. Nonetheless, he persisted in demeaning African-Americans by using it among whites. This is racism.[7]

Pippen's racism infected the disciplinary decisions of which Brown complains. Pippen directly participated in those decisions, first consulting with Murray about the Jerry May incident and then serving as a member of the triumvirate that decided to remove Brown from his serviceman position after the McKinnon complaint. Pippen's "I had to dust my little nigger" comment about other instances in which he disciplined Brown demonstrates that his racism distorted Brown's employment record and extended to decisions of the type at bar. The evidence thus justifies shifting the burden to EMEPA to prove it would have made the same decision regardless of Brown's race.[8] Our Seventh Circuit colleagues have likewise recognized this shifting of the burden of proof.[9]

---

[6]*See, e.g., Turner v. North American Rubber, Inc.,* 979 F.2d 55, (5th Cir.1992).

[7]*See Kendall v. Block,* 821 F.2d 1142 (5th Cir.1987); *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505 (6th Cir.), *cert. denied,* --- U.S. ----, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Hunter v. Allis-Chalmers Corp., Engine Division,* 797 F.2d 1417, 1423 (7th Cir.1986).

[8]*See Kendall v. Block, supra* (calling an employee "nigger" may be direct evidence of discrimination); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir.1990) (general manager's statement that if it were his company he would not hire blacks is direct evidence of discriminatory animus in failing to promote the plaintiff); *Brewer v. Muscle Shoals Bd. of Educ.,* 790 F.2d 1515 (11th Cir.1986) (school superintendent's comment that he did not want to appoint plaintiff to an administrative position because he did not want to see the school system "nigger-rigged" is direct evidence of discriminatory animus, even though the comment was made with regard to an incident occurring after the alleged violation; *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985) (*en banc* ) (selection committee member's characterization of plaintiff as a "black militant" and reference to another black employee as "nigger" was direct evidence of discrimination in failure to promote), *overruled on other grounds by Price Waterhouse, supra.*

[9]*Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 658 (7th Cir.1991) (en banc) ("once the plaintiff in a civil rights case has shown that a forbidden purpose was a substantial factor in the decision to fire him, the burden shifts to the employer to persuade the court that the

Because the district court followed the McDonnell Douglas[10]/Burdine framework, it did not consider whether EMEPA had proven by a preponderance of the evidence that it would have removed Brown from his serviceman position if the illegal consideration of race had not played a role. We might remand for this consideration.[11] After a close review of the record, however, we conclude that the evidence permits of only one result: EMEPA failed in this endeavor. That being so, a prudential concern for scarce judicial resources at the trial and appellate level compels our resolution now.

The evidence at trial exonerated Brown of the misconduct for which the company purported to discipline him. Mrs. May testified that she made it known to EMEPA before the disciplining of Brown that it was her husband, not Brown, who was abusive. Several witnesses testified to McKinnon's bad reputation for peacefulness and veracity, a fact that his close acquaintance—Pippen—knew or should have known. The relevant inquiry is whether Murray, Henson, and Pippen reasonably believed the May and McKinnon complaints, not whether the complaints eventually proved to be accurate. But the reasonableness of their belief obviously is probative of their *bona fides*. Further, if they credited May and McKinnon instead of Brown for racial reasons, EMEPA's burden of proof has not been acquitted.[12] Pippen's testimony that he did not know of McKinnon's unsavory reputation is nothing short of incredible in light of their 25-year acquaintanceship. Brown's ease in securing critical reputation witnesses is a telling factor. Two of the three EMEPA employees Brown called to testify on other matters also knew of McKinnon's poor reputation. We find Henson's cavalier attitude toward McKinnon's hostile conduct towards Brown of surpassing puzzlement. Finally, one cannot be but skeptical of the apparent facility with which customer complaints about Brown reached Murray so readily but Mrs. May's telephone call of

---

plaintiff would have been fired anyway").

[10]*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[11]*See North Mississippi Communications, Inc. v. Jones,* 874 F.2d 1064 (5th Cir.1989).

[12]*Burdine,* citing *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251 (5th Cir.1977), *overruled on other grounds by Burdine.*

apology for her husband's behavior did not.

EMEPA has not proven its contention that Murray was not influenced by racial factors. Louvenia Ford testified without contradiction that Murray minimized her complaint about Pippen's use of racial slurs. Although he ostensibly reprimanded Pippen, Murray apparently never considered that Pippen's blatantly racist attitudes might explain his criticism of Brown and might undermine the objectivity of his advice with respect to Brown's position with the company.

Also informing our judgment is Brown's circumstantial evidence of discrimination. In 1982 the company received an anonymous letter complaining of mistreatment of black customers by Clarence Nance, a white serviceman. That letter was placed in Nance's personnel file but the only discipline Nance received was a verbal warning from his immediate supervisor. In 1990, another black customer complained. This time Nance was warned that he would be transferred if there was another complaint but, unlike Brown, he was not moved to a different service territory nor was any other disciplinary action imposed.

The record reflects that African-American employees were concentrated disproportionately on right-of-way crews, engaged in land clearance and maintenance. Statistics showed that 47 percent of those discharged by EMEPA between 1986 and 1990 were black while the work force was only 25 percent African-American.[13] The record before us, considered as a whole, requires a finding of discrimination; EMEPA did not prove it would have treated Brown the same were he white.[14]

The parties dispute whether Brown resigned or was fired. The district court found that Brown quit but, because it found no discrimination, did not decide whether he had been constructively discharged. Again, there is no need for a remand. The evidence requires a finding of

---

[13]The district court found the sample size too small to be significant. The fault with the size of the sample, however, lies with EMEPA, which refused Brown's request for statistics from prior years.

[14]Our disposition moots Brown's contention that section 107(a) of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071-1100, should be applied to his case. In any event, our decision in *Rowe v. Sullivan,* 967 F.2d 186 (5th Cir.1992), bars retroactive application of this substantive provision of the Act.

constructive discharge.

A plaintiff who resigns after demotion has been constructively discharged if a reasonable employee in the plaintiff's position would have believed that the demotion was a harbinger of dismissal.[15] Such is the situation here. As the district court found, Brown reasonably believed that the transfer from serviceman back to the line crew was a demotion. He also believed that the demotion signaled the company's intent to fire him, as indicated in the tape-recorded meeting. From Brown's perspective, that belief was eminently reasonable. As Brown saw it, management had taken the word of two white problem customers over his and was demoting him for conduct of which he was not guilty. His belief that a discharge was imminent was borne out by developments. One week into the two-week period that he ostensibly was given to consider accepting his reassignment Murray wrote him, accepting his resignation, and thereafter refused to discuss his decision when Brown called to say he had not resigned.

For the foregoing reasons, we REVERSE the district court and RENDER judgment on liability for the plaintiff. This matter is REMANDED to the district court for consideration of the appropriate remedy.

---

[15]*Stephens v. The C.I.T. Group/Equipment Financing, Inc.,* 955 F.2d 1023 (5th Cir.1992).