# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40116

United States Court of Appeals
Fifth Circuit

**FILED**
March 14, 2019

Lyle W. Cayce
Clerk

STATE OF TEXAS,

Plaintiff−Appellee,

versus

ALABAMA-COUSHATTA TRIBE OF TEXAS,

Defendant−Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

For almost thirty years, the State of Texas and one of its Indian tribes, the Alabama-Coushatta Tribe (the "Tribe"), have disputed the impact of two federal statutes on the Tribe's ability to conduct gaming on the Tribe's reservation. The first statute, the Ysleta del Sur Pueblo and Alabama and

No. 18-40116

Coushatta Indian Tribes of Texas Restoration Act[1] (the "Restoration Act"), restored the Tribe's status as a federally-recognized tribe and limited its gaming operations according to state law. The second, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, broadly "establish[ed] . . . Federal standards for gaming on Indian lands." *Id.* § 2702(3).

Soon after IGRA was enacted, this court determined that the Restoration Act and IGRA conflict and that the Restoration Act governs the Tribe's gaming activities. *See Ysleta del sur Pueblo v. Texas* ("*Ysleta I*"), 36 F.3d 1325, 1335 (5th Cir. 1994). Several years later, when the Tribe was conducting gaming operations in violation of Texas law, the district court permanently enjoined that activity as a violation of the Restoration Act.

The Supreme Court then decided *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005), and *City of Arlington v. FCC*, 569 U.S. 290 (2013). And the National Indian Gaming Commission ("NIGC"), which administers IGRA, held, contrary to *Ysleta I*, that IGRA governs the Tribe's gaming activity. Citing those changes in the law, the Tribe asked the district court to dissolve the permanent injunction. The district court refused, the Tribe appeals, and we affirm.

I.

A.

In 1987, Congress passed the Restoration Act to restore "the Federal recognition of" both the Ysleta del Sur Pueblo (the "Pueblo," an Indian tribe in far west Texas) and the Tribe. Pub. L. No. 100-89, §§ 103(a), 203(a), 101 Stat.

---

[1] Pub. L. No. 100-89, §§ 201–07, 101 Stat. 666 (Aug. 18, 1987). The U.S. Code was updated while this case was pending in district court and now omits the Restoration Act, which was previously codified at 25 U.S.C. § 731 *et seq.* Though no longer codified, the Restoration Act is still in effect.

at 667, 670.[2]   The Restoration Act's final section regulates gaming on the Tribe's reservation and lands.  It provides that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on the lands of the tribe."  *Id.* § 207(a), 101 Stat. at 672.[3]   It bars Texas from asserting regulatory control over otherwise legal gaming on the Tribe's reservation and lands.  *Id.* § 207(b), 101 Stat. at 672.  It also gives "the courts of the United States . . . exclusive jurisdiction over any offense in violation" of its gaming restriction and limits Texas to "bringing an action in the courts of the United States to enjoin violations of the provisions of this section."  *Id.* § 207(c), 101 Stat. at 672.

Congress enacted IGRA the following year.  Finding that "existing Federal law d[id] not provide clear standards or regulations for the conduct of gaming on Indian lands," 25 U.S.C. § 2701(3), Congress established "Federal standards for gaming on Indian lands, and . . . a National Indian Gaming Commission . . . to protect such gaming as a means of generating tribal revenue."  *Id.* § 2702(3).  Though its stated purpose is broad, IGRA does not specifically

---

[2] Though the Pueblo has extensively litigated the same questions the Tribe raises, the Pueblo is not a party to this appeal but appears as *amicus curiae.*

[3] That subsection concludes by explaining that the "provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-86-07."  Restoration Act § 207(a), 101 Stat. at 672.  That resolution, in turn, was purportedly passed out of concern that the Restoration Act would not be enacted "unless the bill was amended to provide for direct application of state laws governing gaming and bingo on the [Tribe's] Reservation."  The resolution "respectfully request[ed] [the Tribe's] representatives" in Congress amend the Restoration Act to "provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the state of Texas, shall be prohibited on the Tribe's reservation or on Tribal land."

The significance of the Restoration Act's reference to the Tribe's resolution is disputed. The state contends that the resolution represents a *quid pro quo* in which the Tribe agreed to foreswear gaming for all time in exchange for passage of the Restoration Act.  The Tribe examines the evolution of drafts of the Restoration Act and emphasizes that strong prohibitory language was ultimately deleted.  In any event, the stringent prohibition proposed by the resolution was not included.

preempt the field of Indian gaming law.

IGRA defines three classes of gaming that federally recognized tribes may offer and regulates each differently. Tribes have "exclusive jurisdiction" over "class I gaming," which consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming" associated with "tribal ceremonies or celebrations." *Id.* §§ 2703(6), 2710(a)(1). "Class II gaming" includes "the game of chance commonly known as bingo," *id.* § 2703(7)(A)(i), and certain "card games" either "explicitly authorized" or "not explicitly prohibited" by state law. *Id.* § 2703(7)(A)(ii)(I)–(II). Tribes have the authority to regulate class II gaming, provided that a tribe issues a self-regulatory ordinance meeting statutory criteria and the NIGC approves that ordinance. *Id.* § 2710(b)(1)–(2). "Class III gaming" includes all forms of gaming that are not in class I or II. Class III gaming is lawful on Indian lands only if tribes secure federal administrative and state approval. *Id.* § 2703(8); *see id.* § 2710(d). IGRA created the NIGC to administer its provisions, instructing the NIGC to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this chapter." *Id.* § 2706(b)(10).

## B.

Notwithstanding the Restoration Act, Texas, the Tribe, and the Pueblo have long disputed whether IGRA applies to the Tribe and the Pueblo. Texas avers that IGRA's permissive gaming structure is inconsistent with Sections 107(a) and 207(a) of the Restoration Act, which prohibit gaming that violates Texas law on the Pueblo's and Tribe's lands, respectively. The Tribe maintains that IGRA permits it to conduct gaming operations according to IGRA's three-class structure.

This court first considered the relationship between the Restoration Act and IGRA in *Ysleta I*. Under IGRA, the Pueblo had tried to negotiate a

compact with Texas to permit class III gaming. Texas refused, citing the Restoration Act and insisting that state law prohibited the proposed games. The Pueblo sued to compel Texas to negotiate, and the district court granted summary judgment for the Pueblo.

This court reversed, holding that "(1) the Restoration Act and IGRA establish different regulatory regimes with regard to gaming" and that "(2) the Restoration Act prevails over IGRA when gaming activities proposed by the Ysleta del Sur Pueblo are at issue." *Ysleta I*, 36 F.3d at 1332. With respect to the first ruling, this court found it "significant" that "the Restoration Act establishes a procedure for enforcement of § 107(a) which is fundamentally at odds with the concepts of IGRA." *Id.* at 1334. Based on that finding, we had to determine "which statute [to] appl[y]." *Id.* The Pueblo urged "that, to the extent that a conflict between the two exists, IGRA impliedly repeals the Restoration Act." *Id.* at 1334–35. We rejected that theory, noting that implied repeals are disfavored and that generally "a specific statute will not be controlled or nullified by a general one." *Id.* at 1335 (cleaned up). And "[w]ith regard to gaming," we continued, "the Restoration Act clearly is a specific statute, whereas IGRA is a general one." *Id.*[4]

This court thus concluded "that [the Restoration Act]—and not IGRA—would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law." *Id.* "If the [Pueblo] wishe[d] to vitiate [the restrictive gaming provisions] of the Restoration Act," we declared, "it will have to petition Congress to amend or repeal the Restoration Act rather than merely comply

---

[4] "The former applies to two specifically named Indian tribes located in one particular state, and the latter applies to all tribes nationwide." *Ysleta I*, 36 F.3d at 1335.

No. 18-40116

with the procedures of IGRA." *Id.*[5]

C.

The Tribe was not a party in *Ysleta I*, but, "particularly with regard to the sections concerning gaming," its Restoration Act is almost identical to the Pueblo's. *Id.* at 1329 n.3. We thus suggested in *Ysleta I* that the Restoration Act—and not IGRA—would govern the legality of any gaming operations of the Tribe. Despite the Restoration Act's restrictions, the Tribe maintained a casino on its reservation after *Ysleta I.* And in 2001, the Tribe sued Texas, seeking declaratory relief that its gaming was lawful under IGRA. *See Alabama-Coushatta Tribes of Tex. v. Texas*, 208 F. Supp. 2d 670, 672 (E.D. Tex. 2002). Texas counterclaimed, asking the district court permanently to enjoin the Tribe's gaming activities based on Section 207 of the Restoration Act. *Id.*

Relying on *Ysleta I*, the district court held that the Restoration Act governed the legality of the Tribe's gaming activities. *Id.* at 677–78. And because those activities violated Texas law, the court permanently enjoined them in 2002. *Id.* at 681. This court affirmed, explaining that it was "bound by the determination [in *Ysleta I*] that the Restoration Act precludes [the Tribe] from conducting all gaming activities prohibited by Texas law on tribal lands." *Alabama Coushatta Tribe of Tex. v. Texas*, No. 02-41030, 2003 WL 21017542, at *1 (5th Cir. Apr. 16, 2003) (per curiam) (unpublished).[6]

---

[5] Though *Ysleta I* arose in the context of the Pueblo's trying to conduct IGRA class III gaming, *Ysleta I* does not suggest that the conflict between the Restoration Act and IGRA is limited to class III gaming.

[6] We further ruled that *Ysleta I*'s holding that "the tribe was precluded from seeking relief under the IGRA" was binding, contrary to the Tribe's assertion that it was *dictum.* *Alabama Coushatta Tribe of Tex.*, 2003 WL 21017542, at *1. We explained that the *Ysleta I* panel was required to decide that question "because the Restoration Act placed greater limits on the tribe's ability to conduct gaming operations" than did IGRA. *Id.*

No. 18-40116

D.

The Tribe ceased all gaming for twelve years. But in 2015, it started the process outlined by IGRA to secure NIGC's approval to offer class II gaming. As IGRA requires, *see* 25 U.S.C. § 2710, the Tribe adopted an ordinance authorizing class II bingo gaming—which Texas law permits in several forms[7]—and submitted it to NIGC's Chairman for approval.[8] The Tribe concedes that by seeking that approval, the Tribe was requesting NIGC's formal administrative determination of whether, contrary to *Ysleta I*, the tribe fell within IGRA's ambit.

The Chairman approved the ordinance via letter, explaining that "[n]othing in the IGRA's language or its legislative history indicates that the Tribe is outside the scope of NIGC's jurisdiction."[9] He then determined that the Tribe's reservation—established through the Restoration Act—counts as "Indian lands" under IGRA. Those findings, the Chairman continued, demonstrate that the Tribe's "lands are eligible for gaming under IGRA." The Chairman thus concluded that the Tribe's ordinance was "consistent with the requirements of IGRA and NIGC regulations" and approved it.[10]

Despite initially observing that the Restoration Act and IGRA potentially overlap,[11] the Chairman did not carefully consider whether the Restoration Act limited the jurisdictional reach of IGRA. He opined, instead, that "the

---

[7] *See, e.g.*, 16 Tex. Admin. Code §§ 402.100–.709.

[8] *See* 29 U.S.C. § 2710(b)(1)(B).

[9] Letter from Jonodev O. Chaudhuri, Chairman, Nat'l Indian Gaming Comm'n, to Nita Battise, Chairperson, Alabama-Coushatta Tribe of Tex. (Oct. 8, 2015).

[10] *Id.* The Chairman noted that the Department of the Interior interpreted IGRA as impliedly repealing the Restoration Act, but the Chairman did not adopt that conclusion.

[11] *See id.* (noting that the Restoration Act "applies state gaming laws to the Tribe's lands, with a qualification," thus raising the question "how to interpret the interface between IGRA and the Restoration Act").

7

Tribe possesses sufficient legal jurisdiction over its Restoration Act lands" for IGRA to apply. In other words, the Chairman determined that the Restoration Act does not constitute a "Federal law" that is a "specific[] prohibit[ion]" on the Tribe's proposed gaming. 25 U.S.C. § 2710(b)(1)(A).

With NIGC's approval in hand, the Tribe began to develop Naskila Entertainment Center ("Naskila"), a class II gaming facility offering electronic bingo. Before it opened, the Tribe and Texas forged a prelitigation agreement specifying that the Tribe could operate Naskila pending a state inspection. Texas committed to "advise the Tribe . . . whether the gambling operation meets the requirements of Texas law federalized in the Restoration Act" and reserved the right to seek various forms of relief if it did not.

Upon inspection, the state determined that the electronic bingo at Naskila violated various provisions of Texas gaming law. Then the state revived the decades-old case—in which the district court had permanently enjoined the Tribe's gaming activities that had violated the Restoration Act—by filing a motion for contempt, averring that the gaming at Naskila violated the 2002 injunction.[12] Texas also sought a declaration "that IGRA does not apply to the Tribe because IGRA did not repeal the Restoration Act, and, accordingly," the Tribe "may not conduct Class II IGRA gaming on its lands." The Tribe, in turn, moved for relief from the 2002 injunction, contending that the "[NIGC's] authoritative interpretation" of the Restoration Act and IGRA "both constitutes a change in law and eliminates the sole legal basis for the injunction."

Texas moved for summary judgment on issues related to its motion for contempt, and the Tribe sought partial summary judgment on whether its

---

[12] The Tribe was the plaintiff (as it had sought a declaratory judgment that its gaming activities were lawful under IGRA), and Texas was the defendant. When Texas reopened the case, the court granted its motion to realign the parties, making Texas the plaintiff.

No. 18-40116

bingo operations are class II gaming under IGRA.  The district court granted Texas's motion "with respect to the State's request for a declaration . . . that the Restoration Act, and consequently, Texas law, applies to the Tribe's gaming activities."  The court refused to extend *Chevron* deference[13] to the NIGC's letter concluding that IGRA applied, and it denied the Tribe's motion for relief from the permanent injunction.

The Tribe appeals, asking us to decide whether the district court abused its discretion by refusing to defer to the NIGC's determination that IGRA applies to the Tribe's gaming.  The district court stayed its ruling pending appeal.[14]

## II.

District courts may "relieve a party . . . from a final judgment, order, or proceeding" if "applying it prospectively is no longer equitable." FED. R. CIV. P. 60(b), 60(b)(5).  Where, as here, "the relief sought is dissolution or modification of an injunction, the district court may grant a Rule 60(b)(5) motion when the party seeking relief can show a significant change in statutory or decisional law." *Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 741 (5th Cir. 2016) (cleaned up).  The "significant change" in this case, according to the Tribe, is the NIGC's determination that the Tribe's lands are eligible for gaming under IGRA, combined with *Brand X* and *City of Arlington*.

We review for abuse of discretion the denial of a Rule 60(b)(5) motion for relief from judgment.  *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 405 (5th Cir. 2017).  "A district court abuses its discretion if it: (1) relies on clearly

---

[13] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 567 U.S. 837 (1984).

[14] We have jurisdiction under 28 U.S.C. § 1292(a)(1), which allows for immediate appeal of interlocutory orders "refusing to dissolve or modify injunctions."

erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc) (citation omitted). "It is not enough that granting the motion may have been permissible; instead, denial of relief must have been so unwarranted as to constitute an abuse of discretion." *Moore*, 864 F.3d at 405 (internal quotation marks and citation omitted). While review is highly deferential, "we review *de novo* any questions of law underlying the district court's decision." *Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015) (internal quotation marks and citation omitted).

## III.

This case turns on whether a judicial precedent—holding that the Restoration Act and IGRA conflict and that the former, not the latter, applies to the Tribe's gaming activity—or a later contrary agency interpretation should control. *Brand X* supplied the framework: "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the *unambiguous terms of the statute* and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). We must thus decide whether *Ysleta I* is "a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation." *Id.* at 982–83.

## A.

*Brand X*'s rule that only a prior judicial interpretation adhering to the unambiguous terms of the statute trumps an agency construction "follows from *Chevron* itself." *Id.* at 982. "*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps." *Id.* (citation omitted). So to be faithful to that principle, "judicial interpretations contained in precedents" must be held "to the same demanding *Chevron* step one standard that applies if the court is

reviewing the agency's construction on a blank slate." *Id.* That means that a judicial interpretation should prevail over a later conflicting agency interpretation if the "court, employing traditional tools of statutory construction, ascertain[ed] that Congress had an intention on the precise question at issue." *Chevron*, 467 U.S. at 843 n.9.[15]

Consequently, a prior judicial decision need not "say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency." *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 398 (5th Cir. 2014) (quoting *Fernandez v. Keisler*, 502 F.3d 337, 347 (4th Cir. 2007)).[16] To the contrary, where "the exercise of statutory interpretation makes clear the court's view that the plain language of the statute was controlling and that there existed no room for contrary agency interpretation," the court's interpretation should prevail. *Id.* (quoting *Fernandez*, 502 F.3d at 347–48).[17]

Instead of requiring the prior decision to have called the relevant statute "unambiguous," reviewing courts have looked for the contrary—whether the decision called the statute "ambiguous." For example, this court recently held that an agency's interpretation could prevail over a prior judicial interpretation because the latter had "expressly recognized that the court decided to come

---

[15] *Brand X*, 545 U.S. at 985, offers the rule of lenity as an example of a "rule of construction" that a court might have applied which "requir[ed] it to conclude that the statute was unambiguous to reach its judgment."

[16] *See also Silva-Trevino v. Holder*, 742 F.3d 197, 201–03 (5th Cir. 2014) (upholding a prior judicial interpretation in the face of a conflicting agency interpretation even though the prior decision did not say that the statute was "unambiguous" because the first court was "confident" that "Congress ha[d] spoken directly to the statutory question at hand" based on the text of the statute and Congress's use of the language in other statutes).

[17] *See also Council for Urological Interests v. Burwell*, 790 F.3d 212, 221 (D.C. Cir. 2015) (citation omitted) ("[A] statute may foreclose an agency's preferred interpretation despite such textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque.").

down on one side of a complex debate."[18]  And where other circuits have deferred to an agency's interpretation under *Brand X*, those courts have "emphasize[d] that their prior decisions also noted ambiguity in the text at issue." *See Exelon Wind 1*, 766 F.3d at 398 (collecting citations).[19]

## B.

*Ysleta I* did not find "ambiguity in the text at issue." *Id.*  Instead, after applying canons of construction and legislative history to § 107(a) and (c) of the Pueblo's Restoration Act—which corresponds to § 207(a) and (c) in the Tribe's—this court concluded that "the Restoration Act and IGRA establish . . . fundamentally different regimes." *Ysleta I*, 36 F.3d at 1334.  Indeed, this court was left with "the unmistakable conclusion that Congress—and the Tribe—intended for Texas' gaming laws and regulations to operate as surrogate federal law on the Tribe's reservation in Texas." *Id.*  In other words, this court summarized, "(1) the Restoration Act and IGRA establish different regulatory regimes with regard to gaming, [and] (2) the Restoration Act prevails over IGRA when gaming activities proposed by [the Pueblo or Tribe] are at issue." *Id.* at 1332.

Additionally, we cited evidence that Congress did not intend for IGRA to apply to all Indian gaming.[20]  Moreover, we specifically rejected the theory that

---

[18] *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 738 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 710 (5th Cir. Unit A Oct. 1981) (discussing the "complex dispute" among courts)).

[19] A plurality of the Supreme Court has likewise held that, under *Brand X*, a court need not have said that the statute it was interpreting was "unambiguous."  Instead, "[i]f a court, *employing traditional tools of statutory construction*, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012) (plurality opinion) (quoting *Chevron*, 467 U.S. at 843 n.9).

[20] *See Ysleta I*, 36 F.3d at 1335 (citing later enactments expressly excluding certain tribes from IGRA's coverage as evidence of "a clear intention on Congress' part that IGRA is

No. 18-40116

"to the extent that a conflict between the two exists, IGRA impliedly repeals the Restoration Act." *Ysleta I*, 36 F.3d at 1335. Repudiating that interpretation, we cited (1) the presumption against implied repeals and (2) the canon that a specific statute controls over a general statute. *Id.* With respect to the second, we noted that the Restoration Act was "clearly" the specific statute, "whereas IGRA is a general one." *Id.*

The Tribe counters that, for two reasons, *Ysleta I* does not foreclose the NIGC's determination that IGRA applies to the Tribe. First, the Tribe emphasizes that *Ysleta I*'s holding "was based on nontextual cues from legislative history and canons of construction" and thus could not have "follow[ed] from the unambiguous terms of the statute." *Brand X*, 545 U.S. at 982. That reasoning disregards the fact that the *Brand X* inquiry stems from *Chevron* step one and requires the reviewing court to apply "traditional tools of statutory interpretation"—like the canons and legislative history—to determine whether Congress has spoken to the precise issue. *See Chevron*, 467 U.S. at 843 n.9. And when "the canons supply an answer, *Chevron* leaves the stage." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (internal quotation marks and citation omitted).

Second, the Tribe asserts that *Ysleta I* "never had occasion to determine whether the Restoration Act constitutes a federal law that specifically prohibits [c]lass II gaming on Indian lands under IGRA." That misses what *Ysleta I* did hold—that the Restoration Act's gaming provisions, and not IGRA, provide the framework for deciding the legality of any and all gaming by the Pueblo and the Tribe on their Restoration Act lands. *Ysleta I*, 36 F.3d at 1332.[21]

---

not to be the one and only statute addressing the subject of gaming on Indian lands").

[21] The Tribe suggests that the Restoration Act's application of Texas laws to the Tribe's gambling is somewhat empty because Texas does not "prohibit" gaming as defined in

No. 18-40116

In sum, *Brand X* teaches that a court should not defer to an agency's interpretation of a statute if a "judicial precedent hold[s] that the statute unambiguously forecloses the agency's interpretation." *Brand X*, 545 U.S. at 982–83. That requires us to apply *Chevron* step one to a prior judicial interpretation and to determine whether that court employed traditional tools of statutory interpretation and found that Congress spoke to the precise issue. That is what *Ysleta I* did in holding that "the Restoration Act prevails over IGRA when gaming activities proposed by [the Pueblo or Tribe] are at issue." *Ysleta I*, 36 F.3d at 1332. Consequently, the NIGC's decision that IGRA applies to the Tribe does not displace *Ysleta I*. We thus reaffirm that the Restoration Act and the Texas law it invokes—and not IGRA—govern the permissibility of gaming operations on the Tribe's lands.[22] IGRA does not apply to the Tribe, and the NIGC does not have jurisdiction over the Tribe.

The district court did not abuse its discretion in denying relief from the permanent injunction. The order denying the motion for relief from judgment is AFFIRMED.

---

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). This court expressly rejected that theory in *Ysleta I*, 36 F.3d at 1333−34, holding that "Congress did not enact the Restoration Act with an eye toward *Cabazon Band*." Instead, we were "left with the unmistakable conclusion that Congress—and the [Pueblo]—intended for Texas' gaming laws and regulations to operate as surrogate federal law on the [Pueblo's] reservation in Texas." *Id.* at 1334.

[22] The Tribe alternatively contends that *Ysleta I* should be overruled. The rule of orderliness forbids us from reaching that issue. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (citations omitted) ("[O]ne panel of [this] court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] *en banc* court.").