# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-20222

VICTORIA EAGLIN,

      Plaintiff - Appellant

v.

TEXAS CHILDREN'S HOSPITAL,

      Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2020

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-2245

Before OWEN, Chief Judge, and BARKSDALE and DUNCAN, Circuit Judges.

PER CURIAM:*

      Plaintiff Victoria Eaglin appeals the summary judgment granted in favor of Texas Children's Hospital on her employment discrimination claims under Title VII and 42 U.S.C. § 1981. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-20222

I.

A.

Plaintiffs Annette Williams ("A. Williams") and Victoria Eaglin—who are both black—worked for Texas Children's Hospital ("TCH") as Patient Access Representatives at the cardiology reception desk. Eaglin worked under various supervisors at TCH. The first was Kelly Crumley, who supervised Eaglin for about a year. The next supervisor was Sheila Jones, who took over for Crumley as an interim supervisor. A short time later TCH hired Danielle Williams ("D. Williams") as a permanent supervisor. Enrique Gonzalez was the Director of Patient Admissions and Registration and was the second-level supervisor for both Eaglin and A. Williams.

From time to time, Eaglin's supervisors made comments she found offensive. For example, Crumley once "flipped" Eaglin's hair and asked her how much she paid for it. Crumley also asked if Eaglin and A. Williams ate watermelon and fried chicken on holidays. Jones once told Eaglin that she needed to "[e]ither . . . change [her] hair [color] or . . . go home for the rest of the day." D. Williams referred to Eaglin and A. Williams as "the black girls" and questioned the style and color of Eaglin's hair, asking Eaglin whether she thought "it was professional to wear braids in the medical field."

Eaglin's supervisors also occasionally made comments indicating that someone in TCH's administration wanted to replace Eaglin with a Hispanic employee. For example, Crumley once told A. Williams that "they needed a Hispanic person at" the reception desk because the current desk employees "couldn't communicate with the patients." Jones once told Eaglin that "they want to replace you-all with Hispanics."

Similar incidents with non-supervisors also occurred. Maria Berrera, another TCH employee, once said to A. Williams and Eaglin that the hospital wanted someone Hispanic working at the reception desk. Eaglin was once told

2

No. 19-20222

that other clinic employees called Eaglin, A. Williams, and a third reception desk worker "the black girls."

But not everyone at TCH made offensive remarks. Eaglin testified in her deposition that Gonzalez—her second-level supervisor—never did anything that she felt was discriminatory.

B.

The events that led to the termination of A. Williams' and Eaglin's employment took place in the summer of 2015. A. Williams testified in her deposition that on June 12, 2015, she clocked in at 7:30 or 7:32 a.m. She took her first break around 7:45 a.m. so she could visit her daughter, who had been admitted at the nearby St. Luke's Hospital. She walked to St. Luke's, which is connected to TCH by a walkway. She returned to TCH at approximately 8:00 a.m.

Another hospital employee told a different story about the events of that morning. Tamika Jones, a Patient Access Coordinator at TCH, testified in her deposition that she saw A. Williams on the employee parking garage shuttle between 7:50 and 8:00 a.m. Jones noticed that A. Williams was carrying her work bag and her lunch bag, and so she believed that A. Williams had just come from her car. Apparently suspicious of seeing A. Williams on the bus after the start of Williams' shift, Jones checked the hospital's clock-in system.[1] The system showed that A. Williams had in fact clocked in at 7:32 a.m., at least 18 minutes before Jones saw her on the bus. Jones reported her observations to D. Williams, A. Williams' supervisor.

---

[1] Jones testified in her deposition that she decided to check the clock-in system because of recent complaints from patients that the cardiology check-in desk was always "severely backed up" because of understaffing.

3

After hearing Jones' story, D. Williams checked the employee time system herself and confirmed that there was no documentation that A. Williams had received permission to come in late. D. Williams notified Gonzalez, her supervisor, of her initial findings. D. Williams then spoke to A. Williams, who seemed to give somewhat conflicting answers. First, she said that she had tried to clock in, but the timekeeping system was not working. But A. Williams also denied having instructed anyone else to clock in for her and stated that she did not know how she could have clocked in at 7:32 a.m. since she was not at the hospital.[2] D. Williams also asked Jones to speak to Eaglin. Eaglin told Jones that she did not know how A. Williams could have been clocked in at 7:32 a.m.

At this point, D. Williams spoke again to Gonzalez, who instructed her to contact Beth Camp in HR. Camp asked TCH's security coordinator, Larry Buzo, to review relevant video surveillance footage, and he reported seeing A. Williams enter the floor on which her desk was located around 8:00 a.m. He also noted that a female employee had been at the cardiology desk since at least 7:00 a.m. (The woman was later identified as Eaglin.) Buzo gave several still images from the footage to Camp and D. Williams. A check of the parking garage records revealed that A. Williams' card had been used to enter the garage at 7:41 a.m.

Ultimately, the investigation showed that Eaglin had been present at the desk since before 7:00 a.m.; that A. Williams was not present at the desk at 7:32 a.m. when her username and password were used to clock her in; that A. Williams had first entered the 20th floor at approximately 8:00 a.m.; that Eaglin had clocked in at 6:04 a.m. and was working when A. Williams'

---

[2] This is a different story than A. Williams later recounted during her deposition. *See supra.*

credentials were used to clock her in at 7:32 a.m.; that Eaglin was the only person working at the check-in desk at the time A. Williams' credentials were used to clock her in; and that A. Williams had been clocked in on Eaglin's computer.

D. Williams concluded that A. Williams had asked Eaglin to clock her in before she arrived at work and that Eaglin obliged. D. Williams presented her findings to Gonzalez and recommended terminating both Eaglin and A. Williams' employment for violating TCH policies. Gonzalez reviewed the investigation materials himself and decided that termination was appropriate. Camp agreed. D. Williams prepared records of the decision, which she and Gonzalez signed, and then met with the two women and informed them of the decision.

Eaglin and A. Williams filed a charge of discrimination with the Equal Employment Opportunity Commission and received right-to-sue letters. They then filed this action, alleging they were terminated because of their race in violation of Title VII and 42 U.S.C. § 1981.

After the discovery deadline, Eaglin filed a motion to compel, arguing that TCH had engaged in bad faith in the discovery process. The district court denied the motion, concluding that "the dispute involves matters that fall outside of the agreed discovery period." The district court ultimately granted summary judgment for TCH on the discrimination claims. It concluded that "Enrique Gonzalez's decision was based on the investigation by the plaintiffs' supervisor," and that A. Williams and Eaglin had "fail[ed] to discredit the timekeeping records, parking records and video footage stills that show that Williams was not at work when she was clocked in." Eaglin—but not A. Williams—timely appealed.

No. 19-20222

## II.

We review a summary judgment de novo and apply the same standard as the district court. *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 406 (5th Cir. 2016). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "We construe all facts and inferences in the light most favorable to the nonmoving party," *Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir. 2010), but "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela,* 684 F.3d 564, 571 (5th Cir. 2012) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

"We review a district court's denial of a discovery request for abuse of discretion." *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 936 F.3d 251, 255 (5th Cir. 2019). Generally, "[w]e 'will affirm such decisions unless they are arbitrary or clearly unreasonable.'" *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817 (5th Cir. 2004) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 876 (5th Cir. 2000)). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 446–47 (5th Cir. 2019) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc)).

## III.

Eaglin argues that the district court abused its discretion in denying her motion to compel discovery because TCH's "deleterious conduct" made it

impossible for her to file the motion within the discovery period. She also contends that the court erred in granting summary judgment to TCH because there remained genuine disputes of material fact regarding her discrimination claims. We address the discovery issue first before turning to the summary judgment order.

## A.

District courts "enjoy[] wide discretion in determining the scope and effect of discovery, and it is therefore unusual to find an abuse of discretion in discovery matters." *Id.* (quoting *Equal Emp't Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017)). District courts have broad discretion to enforce deadlines set in scheduling orders. *Culwell v. City of Fort Worth*, 468 F.3d 868, 872 (5th Cir. 2006) (citing *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990)).

Eaglin's arguments that the district court abused its discretion by denying her motion to compel are unconvincing. The predicament in which Eaglin found herself during discovery was one of her own making. Eaglin did not file a motion to compel until after the discovery *and* motions deadlines had expired—deadlines the district court had set in response to the parties' joint motion and proposed schedule. The district court did not abuse its discretion by holding the parties to their word.

Eaglin fails to justify her delay. Instead, Eaglin states that her attorney "had naively not checked the word-for-word details of the [joint proposed] order with an eye to deviations from the court's standard language." Naivete by counsel does not equal abuse of discretion by the district court. Eaglin has failed to show that the district court's decision was "arbitrary or clearly unreasonable." *See Wiwa*, 392 F.3d at 817.

No. 19-20222

B.

The district court assumed without deciding that Eaglin had established a prima facie case of discrimination under Title VII, but concluded that TCH offered legitimate, non-discriminatory reasons for terminating Eaglin's employment. It then ruled that Eaglin failed to show that TCH's reasons were pretextual. We agree.

1.

Title VII prohibits employers from discharging or otherwise discriminating against any individual because of race. 42 U.S.C. § 2000e-2(a)(1).[3] Discrimination in violation of Title VII may be shown through direct or circumstantial evidence. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)). We must first decide whether Eaglin's proffered evidence is direct or circumstantial because this distinction determines the standards we apply. *See Herster v. Bd. of Supervisors of La. St. Univ.*, 887 F.3d 177, 184–85 (5th Cir. 2018).

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). "[S]tatements or documents which show on [their] face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003)).

---

[3] "When used as parallel causes of action, Title VII and Section 1981 require the same proof to establish liability and it would be redundant to refer to both of them." *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 n.3 (5th Cir. 2016) (cleaned up) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999)).

Eaglin's proffered direct evidence merely constitutes "stray remarks." *See Patel v. Midland Mem. Hosp. & Med. Ctr.*, 298 F.3d 333, 343 (5th Cir. 2002). To establish that a comment is more than a stray remark, a plaintiff must show that the comment was (1) related to the plaintiff's status as a member of a protected class, (2) proximate in time to the adverse employment action, (3) made by someone "with authority over the challenged employment decision," and (4) related to the challenged decision. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015). The test focuses on "whether the comments prove, without inference or presumption, that race was *a* basis in employment decisions in the plaintiff's workplace." *Id.* (cleaned up).

None of the statements Eaglin points to satisfy the test. Eaglin points out that Sheila Jones told plaintiffs, a week before their termination, that hospital management wanted to replace them with Hispanic employees. But that evidence is not direct evidence of discrimination. Jones never identified D. Williams or Gonzalez as the individuals seeking to replace Eaglin with a Hispanic employee. And at the time Jones made the remark, she was not Eaglin's supervisor. Though there is evidence that D. Williams asked Jones to help with the timecard violation investigation, Eaglin points to no evidence that Jones somehow influenced Gonzalez's decision—arrived at after his own review of the investigation—to terminate Eaglin's employment. Jones' statement is only a "stray remark" because Eaglin fails to show that it was related to her termination or that it was made by someone with authority over her employment. *See Brown*, 989 F.2d at 861.

Eaglin offers various other statements by both Jones and Crumley. But the statements—even if offensive—were either not made by someone with authority to terminate Eaglin's employment, were not proximate in time to her firing, or were not related to the termination decision. None of the statements,

even "if believed, proves the fact [of intentional discrimination] without inference or presumption." *Id.* For those reasons, we hold that Eaglin's proffered evidence constitutes only "'stray remarks,' and standing alone, [is] insufficient to defeat summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (footnote omitted) (citing *Rubenstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)). Eaglin has produced no direct evidence of discrimination.

2.

Without direct evidence, Eaglin's claim must be analyzed under the *McDonnell Douglas* framework. *Alvarado*, 492 F.3d at 611. The analysis proceeds in three steps. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). First, the plaintiff must establish a prima facie case of race-based discrimination. *Id.* at 802. The burden then shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the employee's rejection"—a reason that "must be legally sufficient to justify a judgment for the defendant." *Rogers*, 827 F.3d at 408 (cleaned up). If an employer does so, the employee then has the burden of showing that the proffered reason was a pretext for discrimination or that the plaintiff's protected characteristic was "a motivating factor for the employment decision." *Id.* (cleaned up). Thus, plaintiffs can avoid summary judgment if they establish a question of material fact showing "(1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Alvarado*, 492 F.3d at 611 (cleaned up).

The parties vigorously dispute who the final decisionmaker over Eaglin's termination was. We do not reach the issue because we conclude that regardless of whether D. Williams or Gonzalez was the decisionmaker, the evidence fails to show a genuine dispute of fact that TCH's legitimate

justification for firing Eaglin—violation of company policy—was pretext. Summary judgment in TCH's favor was therefore appropriate.

TCH asserted that it fired Eaglin because its investigation concluded that she violated TCH policy by falsifying timekeeping records. That is a legitimate, nondiscriminatory reason. *See Wallace*, 271 F.3d at 220; *see also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("[V]iolating a company policy is a legitimate, non-discriminatory rationale for terminating an employee."). Gonzalez had information that could lead to the reasonable conclusion that Eaglin had clocked A. Williams into the system when she was not at work.

Once TCH offered a nondiscriminatory reason, the burden shifted to Eaglin to show that the proffered reason was pretextual. *See Outley v. Luke & Assoc's, Inc.*, 840 F.3d 212, 216 (5th Cir. 2016) (plaintiff must produce substantial evidence showing pretext). The key inquiry is whether the employer acted with discriminatory motive. *Alvarado*, 492 F.3d at 611. Establishing that the employer's conclusion may have been incorrect is not enough to show pretext. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

Here, the evidence does not show a genuine fact issue regarding Gonzalez and D. William's belief that Eaglin violated TCH policy based on the investigation. D. Williams testified that she independently arrived at her recommendation to terminate Eaglin's employment after conducting the investigation. Gonzalez testified that he viewed both Tamika Jones and D. Williams as trustworthy. He, like D. Williams, reviewed the materials produced by the investigation and agreed that they suggested that A. Williams and Eaglin had violated the timekeeping policies.

No. 19-20222

Eaglin's proffered evidence fails to raise a fact issue regarding whether Gonzalez or D. Williams acted with a discriminatory motive. Instead, Eaglin attacks the conclusions reached after the investigation. But her contentions, even if correct, do not create a fact issue about D. Williams' or Gonzalez's good faith belief that Eaglin violated company policy. Rather, Eaglin's evidence goes to the accuracy of that conclusion. "Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence." *Id.* (quoting *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). Eaglin fails to show a fact issue on whether D. Williams and Gonzalez had a good faith belief that she violated company policy.

Other evidence Eaglin points to is not probative on the question of pretext because it centers around TCH's actions during litigation. This evidence includes Eaglin's assertions that TCH "intentionally misidentif[ied] the decision maker"; that TCH has failed to identify a non-African American employee who was fired for timekeeping violations; that TCH submitted sham affidavits at summary judgment; and that TCH "refused" to provide information regarding the individuals who replaced A. Williams and Eaglin at the cardiology desk. None of these assertions, even if true, show that TCH's stated reason for termination was pretextual.[4]

Finally, the evidence Eaglin identifies that might be probative turns out not to suggest pretext and therefore fails to create a genuine issue of fact. Eaglin notes that the surveillance video at issue here was erased—but that

---

[4] Eaglin also asserts that "[a]t every step TCH has behaved like it has something, or multiple things, to hide." Her argument seems to be that TCH did not have a good faith belief that she violated company policy because it interpreted the investigation results differently than she would have. But those unsupported assertions are insufficient to withstand summary judgment. *See McFaul*, 684 F.3d at 571.

was done pursuant to the hospital's data retention plan, and that policy does not suggest that the hospital fired Eaglin because she is black. She also argues that there was scant documentation of TCH's investigation, and that Gonzalez and Camp never met with A. Williams or Eaglin before Gonzalez terminated them. But again, this evidence does not show that TCH's stated reason was pretextual.

Eaglin also points to D. Williams' questioning whether Eaglin's braided hair was "professional." D. Williams—who is black—also apparently referred to Eaglin and A. Williams as "the black girls with red hair." But Eaglin fails to connect either statement to her termination. These isolated statements are insufficient to create an issue of fact regarding whether Eaglin was fired because of her race. *Cf. Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.4 (5th Cir. 1997) (isolated comments not close in time to termination insufficient to show discriminatory animus).

Eaglin's strongest piece of evidence is that after the incident, TCH investigated not only A. Williams and Eaglin, but also Anthea Glenn (also a black woman), a third worker at the cardiology desk. But D. Williams explained that she met with Glenn because she noticed inconsistencies with Glenn's timekeeping records. Since this is a reasonable explanation, the evidence is not "substantial evidence" showing pretext. *See Outley*, 840 F.3d at 216.

For these reasons, we hold that Eaglin failed to show that TCH's proffered justification for firing her was pretextual. She therefore fails to demonstrate that any questions of material fact remain on her claims under

No. 19-20222

Title VII and 42 U.S.C. § 1981. Summary judgment in TCH's favor was appropriate.[5]

AFFIRMED

---

[5] Eaglin's evidence likewise fails to show that TCH's stated reason, while true, "is not the only reason for its conduct, and another motivating factor" was Eaglin's race. *Alvarado*, 492 F.3d at 611 (cleaned up). While Eaglin points to evidence suggesting that "someone" in TCH wanted to have a Hispanic individual working at the cardiology desk, she fails to show that Gonzalez, the decisionmaker, considered that issue in reaching his decision to fire her.